UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

SAMANTHA PIKE and )
NATASHA IRVING, )
                     )
           Plaintiffs, )
                     )
       v. )                 No. 1:22-cv-00360-LEW
                     )
CHARLES F. BUDD, JR. in his )
Individual capacity, )
                     )
           Defendant. )

**DECISION ON DEFENDANT'S MOTION TO DISMISS**

In this action, Plaintiffs Samantha Pike and Natasha Irving allege that Defendant, Charles F. Budd, Jr. violated their constitutional rights when he verbally sexually harassed them and that they are, therefore, entitled to damages under 42 U.S.C. § 1983. Defendant has filed a Motion to Dismiss (ECF No. 6) Plaintiffs' First Amended Complaint (ECF No. 4) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

For reasons that follow, I conclude that Ms. Irving fails to state a claim upon which relief can be granted and that Mrs.[1] Pike's claim fails to overcome Mr. Budd's qualified immunity defense. As to the latter, I conclude, reluctantly, that the law is not clearly established that a state official who verbally pursues a sexual relationship with an employee of a private company violates the Fourteenth Amendment Equal Protection Clause, even if

---

[1] My use of the titles "Ms." and "Mrs." conforms to Plaintiffs' counsel's usage.

the verbal pursuit qualifies as workplace sexual harassment for purposes of a motion to dismiss.  For those reasons, Defendant's Motion to Dismiss will be granted.

## BACKGROUND

The following facts are drawn from Plaintiffs' First Amended Complaint ("FAC") and are assumed to be true for purposes of Defendant's Motion to Dismiss.

### A. Samantha Pike's Allegations

Plaintiff Samantha Pike is a licensed alcohol and drug counselor employed by Wellspring, Inc., a treatment center in Bangor, Maine.  Pike worked as a treatment provider member for the Maine Treatment and Recovery Courts, a specialty docket of the Maine District Court.  Treatment court is a voluntary program that involves a multidisciplinary treatment team, which includes the presiding judge, prosecutor, defense counsel, probation officers, case managers, treatment providers, law enforcement officers, and a coordinator. The treatment court program requires meetings with the presiding judge and treatment court team on a weekly or biweekly basis.  Pike spent roughly 16-25 hours per month in treatment court.  Defendant Charles Budd, Jr. was the judge assigned to the treatment court in Penobscot County during times relevant to this action.

When Pike first met Budd, a male employee of Wellspring was the lead on the treatment court.  In February of 2018, Pike began working for Wellspring as the lead on the treatment court.  After she took over this position, Budd started to bring in Boston cream doughnuts.  Pike attributes a perverse incentive or motivation on Budd's part in that regard.

2

From July 25 through July 28, 2022, Pike and other members of the treatment court team, including Budd, attended a work-related conference called the National Association of Drug Court Professionals (NADCP) in Nashville, Tennessee.  On the evening of July 25, 2022, after the daily programming had ended, Pike saw Budd in a downtown bar where they chatted a few times.  As it turned out, Budd and Pike were staying at the same hotel.  Towards the end of the evening, Budd asked Pike if she would like to share an Uber or Lyft back to the hotel.  She agreed.  On the ride home, Budd asked Pike what room she was in, and she told him.  Budd responded, falsely, "Oh really?  I'm directly across the hall from you."

When they returned to the hotel, Budd commented on how pretty he thought Pike was.  Pike felt extremely uncomfortable.  When they got off the elevator, they both walked down the hall to what Pike believed would be separate rooms across from each other.  However, Budd did not go into a hotel room of his own and instead held open the door to Pike's room and said, "Well, I'm not going to come in unless you invite me in."  This comment made Pike "feel not only uncomfortable but unsafe and frightened."  FAC ¶ 38.  Based on her body language, it should have been apparent to Budd that his sexual advances were obviously unwelcome, and Pike backed out of her hotel room and into the hallway.

Budd then asked Pike if she wanted to go down to the lobby and have another drink.  Pike felt uncomfortable and said that she could not find her phone or wallet.  Budd said that he would buy her a drink.  Pike then responded that she did not have her ID.  Budd said that he would go up to the bar and order the drinks.  Pike felt that she needed to get Budd away from her room, so she eventually agreed to go downstairs with him.  Once in

3

the lobby bar, Pike immediately walked to the bathroom where she had to calm down and stop herself from crying.

After Budd acquired drinks, he talked about his marriage being "rocky" and stated that his wife often thought he was cheating on her.  Budd told Pike that he was often sexually propositioned by women due to his role as a judge.  Pike told Budd that she was happily married and had two children.  Budd then commented that he found two of their mutual treatment court clients extremely attractive, and he hoped the rest of the team did not think he was favoring these attractive female treatment court clients.

Pike said that she was tired and that she needed to go back up to her room.  Knowing by that point that Budd's room was not in fact across from hers, Pike asked if he needed help figuring out where his room was.  Budd responded, "Oh no, Mrs. Pike.  I know exactly where my room is."  Budd was smirking and almost chuckled.  Pike had confirmation that Budd lied to her about having a room across from hers so that he could get her alone upstairs and then enter her hotel room.

The next day, Pike received a text from Budd asking if she wanted to share a ride to dinner.  Pike had told two of her coworkers how uncomfortable the events of the preceding night had made her and asked for these coworkers to wait for her to come to their hotel and then go to dinner together so she would not have to ride alone with Budd.

At dinner, Budd followed Pike around and tried to make conversation with her repeatedly, though she tried to avoid him.  After dinner, Budd asked where Pike and the other Wellspring female employees were going, and then followed them to that location.  At the next location, Budd came up behind Pike on multiple occasions to engage her in

conversation. Pike was so uncomfortable with Budd's pursuit that she asked a probation officer to stay by her side at the bar.

At the next location, Budd sat beside Pike and said, "That bartender doesn't think my jokes are funny. It's okay because my friend right here is much prettier anyway." Budd was referencing Pike. For the rest of the evening, Budd followed Pike wherever she went. Pike asked coworkers to help get her out of the bar and away from Budd. One of the coworkers acknowledged that Budd was following Pike "with his eyes" everywhere that she went and would pop up behind her shoulder every time she tried to get away from him. Pike feigned a trip to the bathroom and then left the bar. Based on Budd's escalating behavior and his actions the previous night, Pike feared that Budd would try to sexually assault her if he accompanied her back to the hotel.

After departing, Pike texted Budd, "I'm heading back with the girls. Ryan is staying for a bit tho. Have a good night." Within minutes, Budd texted back: "You still here? Can't believe you ditched me." Pike responded: "Sorry! Totally not intended. We went outside and there were a bunch of Lyfts outside and we just headed back. Ryan said you were all set though." Budd responded: "I haven't been ditched in a long time. But I recognize the rhythms. No more Boston creams for you." The next day Pike skipped the sightseeing tour with the rest of the group because she was fearful of being pursued by Budd.

When Pike returned home, she called her direct supervisor at Wellspring and told her about Budd's conduct. She also shared the story with human resources at Wellspring. Pike was so anxious and upset about appearing in court before Budd that she did not attend

the next session of the treatment court and asked her supervisor and another employee to go instead.

When Pike next walked into treatment court, Budd placed a bag in front of her with two Boston cream doughnuts in it. After the team meeting, Budd walked into the courtroom, wearing his robe, and said, "Ms. Pike, I'd like to see you out back in chambers." Pike did not want to cause a scene or disobey Budd in court, so she walked back toward chambers alone, in fear.

Budd sat behind his desk and said that he had been "thinking a lot about our trip to Nashville." He said he was going to be "making a lot of changes at home" and/or in his marriage. It was clear to Pike that Budd was talking about leaving his wife and that he intended to continue pursuing her. As she slowly backed out of the doorway, Budd came up behind her and said: "Ms. Pike, one more thing. You are a very good listener." Pike later that night received a phone call from the overseer of the treatment court, who said that he had received a report about what happened with Budd and that he would be filing an official complaint.

**B. Natasha Irving's Allegations**

Plaintiff Natasha Irving is the District Attorney for Maine's Sixth Prosecutorial District, a district that does not include Penobscot County, where Budd ordinarily presided. Irving also attended the NADCP conference in Nashville. Irving attended a program during cocktail hour where she was chatting with Richard Gordon, who oversees the treatment court. Budd approached them and Irving introduced herself. Within three minutes of meeting Irving, Budd asked Irving where she was staying. Irving indicated that

she had to stay at a different hotel from where the conference was being conducted because the judges booked all the rooms at the hotel.  Budd told Irving, "Well, you can come sleep with me in my room."  Mr. Gordon was present when Budd made this statement and he immediately tried to get Budd away from Irving, saying something like, "Ok, let's go."

Irving did not say another word to Budd.  She was speechless, shocked, and offended by this statement, especially coming from a judge.  Irving felt incredibly humiliated and professionally demoralized that a judge would sexually proposition her, especially in front of a colleague.

## C. Plaintiffs' Claims

Plaintiffs' single-count FAC claims that Budd, acting individually and under color of state law, deprived them of the right to be free from "unconstitutional sexual harassment" in violation of the Equal Protection Clause.  FAC ¶ 1.  In addition to the Plaintiffs' shared claim of harassment, the Plaintiffs allege that Budd engaged in quid pro quo sexual harassment and created a hostile and abusive work environment.  *Id.* ¶¶ 2, 91-92, 109.  Pike also claims that Budd retaliated against her for rejecting his advances.  *Id.* ¶¶ 2, 91-92.  It must be noted, however, that when it comes to quid pro quo harassment[2] and retaliation[3], Plaintiffs' allegations are conclusory; none of the facts alleged, singularly

---

[2] "Quid pro quo sexual harassment claims require proof of these elements: (1) 'an employee or supervisor uses his or her superior position to extract sexual favors from a subordinate employee,' and (2) 'if denied those favors, retaliates by taking action adversely affecting the subordinate's employment." *Xiaoyan Tang v. Citizens Bank*, 741 F. App'x 11, 13 (1st Cir. 2018) (quoting *Valentín-Almeyda v. Mun. Of Aguadilla*, 447 F.3d 85, 94 (1st Cir. 2006)); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998) ("Because Ellerth's claim involves only unfulfilled threats, it should be categorized as a hostile work environment claim which requires a showing of severe or pervasive conduct." (rejecting quid pro quo contention)).

[3] "To make out a prima facie case of retaliation . . . the plaintiff must prove that (1) he or she engaged in protected activity . . ., (2) he or she suffered an adverse employment action, and (3) the adverse employment

*(continued next page)*

or in combination, portrays a quid pro quo or retaliation scenario.[4]  For relief, Plaintiffs

request damages and fees but not injunctive relief.[5]

## DISCUSSION

To avoid dismissal, each of the Plaintiffs must plead in their complaint "a short and

plain statement of the claim showing that [she] is entitled to relief." Fed. R. Civ. P. 8(a)(2).

The complaint must provide "enough facts to state a claim to relief that is plausible on its

face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In applying this standard,

the Court will accept all factual allegations as true and consider whether the facts, along

with reasonable inferences that may arise from them, describe a plausible, as opposed to

merely conceivable, claim.  *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir.

2011); *Sepúlveda–Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010).  The

Court will not accept as true, however, statements that are merely conclusory recitations of

legal standards.  *Medina-Velazquez v. Hernandez-Gregorat,* 767 F.3d 103, 108 (1st Cir.

2014).

Plausible "means something more than merely possible," *Schatz v. Republican State

Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012), but is "not akin to a probability

requirement."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).

---

[4] I agree with Defendant that the provision or withholding of doughnuts does not rise to the level of a tangible and meaningful benefit or harm for the purposes of a disparate treatment, quid pro quo, or retaliation analysis.

[5] Plaintiffs' FAC does not provide allegations related to the Defendant's ability to engage in further harassment, presumably because Defendant no longer presides over the drug court or over any court for that matter.  For this reason, Plaintiffs' claims do not suggest there is a need for injunctive relief.

Furthermore, "a well-pleaded complaint may proceed even if it appears that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (quotation marks omitted).

Plaintiffs' claims arise under federal law, more specifically the Civil Rights Act of 1871. "Section 1 of that Act, now codified at 42 U.S.C. § 1983, created a species of federal tort liability for individuals to sue state and local officers for deprivations of constitutional rights." *Thompson v. Clark*, 142 S. Ct. 1332, 1336-37 (2022). "Under the terms of the statute, '"[e]very person" who acts under color of state law to deprive another of a constitutional right [is] answerable to that person in a suit for damages.'" *Rehberg v. Paulk*, 566 U.S. 356, 361 (2012) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976) (citing 42 U.S.C. § 1983)). To state a claim under section 1983, a plaintiff must allege facts that demonstrate two things: first, "that the conduct complained of has been committed under color of state law," and second, "that this conduct worked a denial of rights secured by the Constitution or laws of the United States." *Barreto–Rivera v. Medina–Vargas*, 168 F.3d 42, 45 (1st Cir. 1999).

Budd argues for dismissal on three grounds. First, he contends that he was not acting under color of state law at the time of the claimed events. Second, Budd argues that the facts as alleged by Plaintiffs do not meet the standards required to find a meritorious sexual harassment claim. Third, Budd argues that even if he was found to be acting under the color of state law and a plausible claim is stated against him, the action still should be summarily dismissed because he is veiled in the protection of qualified immunity.

## A. Conduct Under Color of State Law

"Section 1983 supplies a private right of action against a person who, under color of state law, deprives another of rights secured by the Constitution or by federal law." *Redondo–Borges v. U.S. Dep't of Hous. and Urban Dev.*, 421 F.3d 1, 7 (1st Cir. 2005) (quoting *Evans v. Avery*, 100 F.3d 1033, 1036 (1st Cir. 1996)).[6] Section 1983's under color of state law requirement is not implicated unless the state actor's conduct occurred in the course of performing an actual or apparent official duty, or unless the conduct is such that the actor could not have behaved in that way but for the authority of the actor's office. *Martinez v. Colon*, 54 F.3d 980, 986 (1st Cir. 1995); *see also Michum v. Foster*, 407 U.S. 225, 239 (1972) ("Section 1983 opened the federal courts to private citizens, offering a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation.").[7]

The acts of officials "in the ambit of their personal pursuits" are not state action. *Screws v. United States*, 325 U.S. 91, 111 (1945). To determine if the defendant was solely engaged in a personal pursuit at the time of the challenged conduct, the court must assess the defendant's conduct in light of the totality of the circumstances, including the nature of the conduct and the relationship of the conduct to the performance of the actor's official duties. *Parrilla-Burgos v. Hernandez-Rivera*, 108 F.3d 445, 449 (1st Cir. 1997).

---

[6] The requirement that a Section 1983 plaintiff show that the defendant acted "under the color of state law" is the functional equivalent of the Fourteenth Amendment's "state action" requirement. *Santiago v. Puerto Rico*, 655 F.3d 61, 68 (1st Cir. 2011).

[7] Acts based on authority, but in excess of authority, are still actions taken under color of law. *Parrilla-Burgos v. Hernandez-Rivera*, 108 F.3d 445, 449 (1st Cir. 1997); *see also Screws v. United States*, 325 U.S. 91, 109 (1945) ("Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law."). The application of excessive force during an arrest is the classic example.

Budd argues that at the time of the alleged conduct, he was not acting under the color of state law, noting that judges do not act under color of state law at all times just by virtue of their perceived legal authority. Budd says that the alleged actions describe only personal pursuit that would be excluded from the performance of his obligations as a judge. Plaintiffs argue that Budd's position of authority as a judge was the reason he was in Nashville and that he attended the conference as a judge in charge of the treatment court. Pike also alleges conduct that occurred at the courthouse, in Budd's chambers, while Budd was in his judicial robe, implicating his official authority.

### 1.  Plaintiff Natasha Irving's Claim

Irving claims that Budd violated her "constitutional right to equal protection by engaging in quid pro quo sexual harassment . . . and creating a hostile environment." FAC ¶ 109. However, what she alleges in terms of the facts is that Budd said, in front of a professional colleague in a social context, "Well, you can come sleep with me in my room."

Although Budd's alleged remark was obtuse, sexist and demeaning, I do not see how a reasonable fact finder could conclude that it was the product of Budd's performance of any actual or apparent duty of his judicial office. Budd was not carrying out any judicial act and he had no other authority that he could have exercised over Irving when he made the alleged remark. Because Budd's conduct was not action taken under color of state law, Irving fails to state a plausible section 1983 claim.[8]

---

[8] Even if there were state action (there was not), Irving fails to assert facts that would support a plausible quid pro quo claim, *see*, *supra*, note 2, or a claim of "severe" harassment, *see Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'").

### 2.  Plaintiff Samantha Pike's Claim

Pike's claim is more nuanced than Irving's insofar as she and Budd shared a working relationship on the state treatment court, a venue in which Budd was empowered to perform the duties of his judicial office.  This venue extended into Budd's judicial chambers; another location associated with official judicial conduct.  Pike's allegations include inappropriate comments and conduct that occurred at the courthouse, while both parties were working, while Budd was in his judicial garb, and within his chambers.

The First Circuit has warned us to avoid simplistic solutions when it comes to classifying state actor conduct.  *Barreto-Rivera*, 168 F.3d at 45.  It has also advised that "[t]he purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."  *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).  Given this guidance, it is reasonable to ask whether Budd felt liberated, through a combination of narcissism and megalomania, to make these demeaning comments because of the station and position of power that he held.  It is not uncommon for persons who perform their job duties in a court to perceive judges as wielding authority even when they are off the bench.  Fair-minded persons will recognize that this power difference, at the least, would have contributed to the distress Pike felt in the workplace following her return from the conference, even if they may rule out treating Budd's personal pursuit of Pike during the conference as state action.

The same power dynamic has been discussed by the First Circuit in relation to police officers who can pose, by virtue of their station, a physical threat to members of the public

12

(and to each other).  Yet, even in that context, the First Circuit has observed that profoundly irresponsible behavior is not made into state action simply by our outrage that a state actor would behave in a loathsome fashion.  In *Martinez v. Colon*, 54 F.3d 980 (1st Cir. 1995), for example, one police officer tormented another with the threat of gun violence for reasons "personal in nature" and, ultimately, fatally shot him.  *Barreto-Rivera*, 168 F.3d at 44 (discussing *Martinez*).  On appeal from a summary judgment ruling, the First Circuit found no state action.  *Id.*  In another case, an off-duty police officer presented his identification and announced his authority to quiet a crowd before inviting a bar patron outside to settle a dispute, during which he fatally shot the patron.  *Parrilla-Burgos*, 108 F.3d at 450.  Significant to the First Circuit's affirmation of the district court's entry of summary judgment based on the lack of state action were the fact that the officer "made no further pretense that he was acting as a police officer" once the two men were outside and the fact that the officer's bravado had done nothing "to cause [the victim] to refrain from exercising his legal rights."  *Id.* at 450-51.

In contrast, the First Circuit found that certain attributes of a confrontation between officers raised a genuine issue of state action.  There, an on-duty officer attempted to conduct a traffic stop on an off-duty officer.  The off-duty officer drove to his home and, after being clubbed with a baton, retreated into his home before reemerging with a melee weapon.  Witnesses removed the weapon from his grasp before he could use it.  Meanwhile, the on-duty officer radioed for backup and ordered the off-duty officer to stop approaching, threatening to shoot him.  The off-duty officer approached nonetheless and was fatally shot.  *Barreto-Rivera*, 168 F.3d at 44.  The First Circuit, citing its "key determinant" for state

13

action — "whether the actor, at the time in question, purposes to act in an official capacity or to exercise official responsibilities pursuant to state law" — held that a genuine issue arose from the circumstances and that the district court had improperly engaged in a variety of inference-drawing against the plaintiff. *Id.* at 46 (quoting *Martinez*, 54 F.3d at 986). More specifically, the Circuit listed the facts that the defendant officer was on duty, in uniform, patrolling in a police vehicle, initiated the encounter with a traffic stop, demanded license and registration, used a nightstick to subdue the off-duty officer (symbolic of police authority), requested assistance by radio, and then shot the unarmed man. *Id.* at 48.

When the instant case is compared to the foregoing exemplars of police violence cases—imperfect but illustrative comparators—there is nothing in the allegations that suggests Budd "purpose[d] to act in an official capacity or to exercise official responsibilities pursuant to state law" when he pursued Pike. *Martinez*, 54 F.3d at 986. Moreover, while Pike's subjective experience of emotional distress certainly was reasonable, the *Barreto-Rivera* Court also noted:

> Although we accorded the subjective reactions of the victim some relevance in the color of law analysis in *Martinez* and *Parrilla–Burgos*, the primary focus of the color of law analysis must be on the conduct of the police officer. *Cf. Pitchell v. Callan*, 13 F.3d 545, 548-49 (2d Cir. 1994) (noting that plaintiff's argument "erroneously centers on [the victim's] subjective reaction to [the officer's] conduct rather than the nature of [the officers'] activity, and misses the essence of the color of law requirement and the protection afforded by section 1983").

*Barreto-Rivera*, 168 F.3d at 47-48 (emphasis supplied). Based on this language, some objective purpose or presumption or at least pretense to wield state power appears to be an essential component for constitutional liability to arise under section 1983.

Given the lack of any facts to suggest that Budd's alleged harassment was the product of any actual or apparent state authority and given that the First Circuit instructs that a victim's subjective experience is of limited relevance in the absence of conduct "purposed" upon exercising state power, the finder of fact would indeed be hard-pressed to find state action based on Pike's allegations. Still, "a well-pleaded complaint may proceed even if . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (quotation marks omitted). Without deciding the issue of state action in relation to Mrs. Pike's claim, I proceed to the issue of Budd's access to qualified immunity.

**B. Qualified Immunity**

The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would know at the time of the challenged conduct. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The qualified immunity inquiry entails a two-part test. *Id* at 232. A court must decide (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional or other federal right and (2) whether the right was clearly established at the time of the defendant's alleged violation. *Id.* The second, "clearly established" step of the qualified immunity analysis has, in turn, two aspects. First, "[t]he contours of the right must be sufficiently clear" so that a reasonable official would comprehend that his or her actions implicated the right. A*nderson v. Creighton*, 483 U.S. 635, 640 (1987). Second, the Court must ask whether a reasonable defendant would have understood that the conduct in fact violated the plaintiff's rights "in light of the specific context of the case, not as a

broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). *See Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009) (bifurcating the second step of the Supreme Court's qualified immunity test into "two aspects"). Taken together in the context of a constitutional claim, these two aspects of the second step of the qualified immunity test frame "the salient question [of] whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." *Maldonado*, 568 F.3d at 269.

It is not necessary for courts to follow the two-step analysis sequentially. *Id. at* 270. This discussion focuses on the "clearly established" part of the qualified immunity analysis without resolving the underlying inquiry into whether the allegations state a plausible claim.[9] *See Pearson,* 555 U.S. at 236 ("The judges of the district courts and the courts of

---

[9] The First Circuit prescribes the hostile work environment standard of Title VII in harassment-based equal protection claims. *Lipsett,* 864 F.2d at 896*; see also Rivera v. Puerto Rico Aqueduct & Sewers Auth*., 331 F.3d 183, 192 & n.7 (1st Cir. 2003) (describing § 1983 and Title VII as affording parallel remedies in the employment context). "A hostile work environment is one 'permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Roy v. Correct Care Sols., LLC*, 914 F.3d 52, 61 (1st Cir. 2019) (quoting *Harris v. Forklift Sys. Inc*., 510 U.S. 17, 21 (1993)). "[S]everal factors, none of which are individually determinative, are relevant: the severity of the conduct, its frequency, whether it is physically threatening or not, and whether it interfered with the victim's work performance." *Gerald v. University of Puerto Rico*, 707 F.3d 7, 18 (1st Cir. 2013)*; see also Conto v. Concord Hosp*., *Inc*., 265 F.3d 79, 81 (1st Cir. 2001) (noting that a hostile environment claim "necessarily entail[s] a fact-specific assessment of all the attendant circumstances"). "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Servs*., *Inc*., 523 U.S. 75, 81 (1998) (quoting *Harris*, 510 U.S. at 23). "A worker need not be propositioned, touched offensively, or harassed by sexual innuendo in order to have been sexually harassed." *Billings v. Town of Grafton*, 515 F.3d 39, 48 (1st Cir. 2008) (quoting *Quick v. Donaldson Co*., 90 F.3d 1372, 1379 (8th Cir. 1996)).

   For purposes of ruling on a motion to dismiss, and assuming the existence of action taken under color of state law, Pike's allegations appear to state a plausible claim of sex-based harassment in the workplace. However, there is an issue concerning Pike's status as the employee of a private entity and how that status relates to an equal protection claim founded on verbal harassment, and that issue is the focal point of my qualified immunity discussion. In other words, even if the allegations describe a plausible case of severe harassment, there remains a legal question whether Pike states a claim for which relief may be granted. I
*(continued next page)*

appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."). The Supreme Court has explained that the "dispositive inquiry" for the second qualified immunity prong is "whether it would have been clear to a reasonable officer in the [official's] position that [their] conduct was unlawful in the situation [they] confronted or created." *Wood v. Moss*, 572 U.S. 744, 758 (2014) (cleaned up). This inquiry must be taken in light of the specific context of the case, not as a broad general proposition. *Whalen v. Massachusetts Tr. Ct.*, 397 F.3d 19, 27 (1st Cir. 2005).[10] "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (cleaned up) (citations omitted). An official can be on notice that an action violates established law even in novel factual circumstances. *Id.* at 741.

A government official who is not contravening clearly established law is entitled to qualified immunity. *Taylor v. Barkes*, 575 U.S. 822, 825 (2015). Because qualified immunity confers immunity from suit—even at the pleading stage of litigation—an interlocutory order denying a meritorious motion to dismiss based on qualified immunity

---

am reluctant to determine that issue at the first step of the qualified immunity test because counsel's "briefing of constitutional questions [has been] inadequate." *Pearson*, 555 U.S. at 239.

[10] The Supreme Court repeatedly has "told courts . . . not to define clearly established law at a high level of generality. . .. The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Consequently, for reasons I will attempt to elucidate, this case presents a more complicated question than whether it is clearly established that workplace sexual harassment violates the equal protection clause.

will not evade appellate review, and thus there is no practical utility in deferring the matter until the summary judgment stage if it cannot confidently be stated that the unconstitutionality of the defendant's alleged conduct was clearly established. *Mitchell v. Forsyth*, 472 U.S. 511, 525-26 (1985); *see also Siegert v. Gilley*, 500 U.S. 226, 233 (1991) (affirming dismissal of claim based on qualified immunity).

When the defense of qualified immunity is asserted "[t]he plaintiff bears the burden of demonstrating that the law was clearly established at the time of the alleged violation," and it is a burden that ordinarily cannot be overcome with abstract proclamations or conclusory and circular argument that the unconstitutionality of conduct was clearly established because the conduct in question was unconstitutional. *Mitchell v. Miller*, 790 F.3d 73, 77 (1st Cir. 2015). In effect, Pike bears the burden of demonstrating that, as of the dates of the alleged sexual harassment, the law was clearly established such that a reasonable official in Budd's position would have known that his actions would violate the Constitution. While citation to a case directly on point is not necessary, a plaintiff must show that existing precedent placed the statutory or constitutional question beyond debate. *Taylor*, 575 U.S. at 825. Given the peculiar context of this case, what is needed from Pike is a showing addressed to the constitutional implications of sexual advances occurring in the workplace or enabled by work relationships and undertaken by state actors toward persons who are not also state employees.[11]

---

[11] To be perfectly clear, it is not my expectation that Pike needs to identify precedent in which a judge is the defendant.

Pike has not carried the burden the law assigns to her.  Pike did not spotlight "controlling authority" or "a robust consensus of cases of persuasive authority" to clearly establish that Budd's actions had constitutional implications under the circumstances alleged.  *Plumhoff v. Rickard*, 572 U.S. 765, 780 (2014).   In Plaintiffs' Response in Opposition to Defendant's Motion to Dismiss (ECF No. 11), Pike's counsel identified precisely no First Circuit precedent or circuit court consensus in support of the proposition that a state official would be liable to someone employed by a private entity based on verbal sexual advances occasioned by a collaborative working relationship.  Instead, counsel stated, quite remarkably, that it "does not matter."  Opp'n Br. at 17.  They then point to the Maine Code of Judicial Conduct—not controlling law on constitutional questions—and say that Budd's bid for qualified immunity "is both preposterous and unsupported by any precedent" and therefore "should be flatly rejected by this Court."  *Id.* at 20.  Given this presentation, there is nothing to point to that would allow Pike to clear the hurdle presented by the qualified immunity defense.[12]

Even though it is a plaintiff's burden to demonstrate the clarity of the law, I have performed some independent research to determine if there is a robust consensus of cases that clearly establish the availability of an equal protection claim in the context of this case.

---

[12] At the conclusion of the oral argument on the Motion to Dismiss, Plaintiffs' counsel conceded not having performed exhaustive research on the issue of whether Budd's conduct violated clearly established law and requested a few days to file caselaw with the Court without further briefing.  I agreed and also allowed Defendant to file any further caselaw on the issue, also without briefing.  However, on the deadline for Plaintiffs to file supplemental authority, Plaintiffs' counsel filed a Motion for Leave to File a Supplemental Opposition to the Motion to Dismiss, with an extended deadline, without providing any supplemental authority.  I denied the motion.  Counsel then filed two circuit court opinions for my consideration, one of which, *Starnes v. Butler Cty. Ct. of Common Pleas*, 971 F.3d 416 (3d Cir. 2020), I have referenced in the discussion.  The other, a case addressed to injunctive relief, does not have any bearing on this decision.

What makes finding similar cases difficult are certain characteristics of Pike's claim, which characteristics ordinarily are material to workplace harassment claims. To begin, to the extent Pike relies on allegations of quid pro quo harassment and retaliation, there is nothing in the facts she alleges that supports either contention. Thus, although there is a great body of caselaw that clearly establishes that equal protection is violated by an abuse of state authority to leverage sexual favors or punish the rejection of sexual advances—involving plaintiffs in both public and private settings[13]—the allegations in this case do not describe a plausible quid pro quo or retaliation scenario. The allegations simply fail to suggest that Budd ever attempted to exert or even pretended to have any authority over Pike's employment prospects or any other aspect of her life. More specifically, Budd neither promised advancement nor threatened adverse consequences in connection with any of the alleged sexual overtures.[14]

This is a case of sexual harassment limited to verbal efforts to establish a sexual relationship without quid pro quo or retaliatory misdeeds. The viability of equal protection claims of this kind is clearly established in certain scenarios. However, overwhelmingly, the dominant fact patterns in this area have involved workplace harassment directed at government employees and teacher harassment of public-school students. *See*, *e.g.*, *Roy v. Correct Care Sols.*, *LLC*, 914 F.3d 52, 72 (1st Cir. 2019) (state corrections officer); *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 884 (1st Cir. 1988) (university student). And

---

[13] *See*, *e.g.*, *Doe v. Beaumont Ind. Sch. Dist.*, 615 F. Supp. 3d 471, 492-93 & n.15 (E.D. Tex. 2022) (collecting cases).

[14] As indicated in footnote 4, supra, I agree with Defendant that the provision or withholding of doughnuts does not rise to the level of a quid pro quo or retaliatory act.

in the context of employment discrimination cases, although courts sometimes make relatively broad statements, the cases appear to be limited to suits brought on behalf of state and municipal employees, not employees of private companies that provide contract services to state or municipal governments. *See*, *e.g.*, *Rivera v. Puerto Rico Aqueduct & Sewers Auth.*, 331 F.3d 183, 192 (1st Cir. 2003) ("Harassment of an employee because of her faith, whatever guise it assumes, may constitute religious discrimination under the Equal Protection Clause of the Fourteenth Amendment." (involving claim of public employee plaintiff)); *Pontarelli v. Stone*, 930 F.2d 104, 113-14 (1st Cir. 1991) ("[O]n-the-job sexual harassment claims are within the purview of section 1983 . . .." (involving police officer plaintiffs)).

Even in more recent opinions from the Second Circuit, a circuit that appears to have considered a greater number of equal protection claims than the First Circuit, both state employment and state supervision appear to be basic prerequisites of a section 1983 equal protection claim. *See*, *e.g.*, *Williams v. New York City Hous. Auth.*, 61 F.4th 55, 70 (2d Cir. 2023) ("Through its application of the Equal Protection Clause of the Fourteenth Amendment, Section 1983 protects public employees from various forms of discrimination, including hostile work environment claims . . .." (cleaned up)); *Naumovski v. Norris*, 934 F.3d 200, 212 (2d Cir. 2019) ("A plaintiff who claims sex discrimination in public employment in violation of the Fourteenth Amendment may bring suit pursuant to § 1983."); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 88-89 (2d Cir. 2015) ("Once the color of law requirement is met, a plaintiff's equal protection claim parallels . . . Title VII . . ., except that a § 1983 claim, unlike a Title VII claim, can be brought against

an individual." (reversing dismissal based on allegation of plausible adverse employment action, including as to individual actors who had supervisory input in the evaluation and discipline of public school employees)); *Raspardo v. Carlone*, 770 F.3d 97, 113-14 (2d Cir. 2014) ("[S]tate and local officials can be held individually liable under 42 U.S.C. § 1983 for violating the Equal Protection Clause of the Fourteenth Amendment by discriminatory acts against those who work under them." (evaluating claims of current and former police officers)).   Without canvassing every circuit, this does appear to be the recurring theme.   *See*, *e.g.*, *Starnes v. Butler Cty. Ct. of Common Pleas*, 971 F.3d 416, 426-27 (3d Cir. 2020) (borrowing from Title VII to evaluate equal protection claim and observing that "[a]n *employer* violates Title VII if the employee's sex was one but-for cause of her disparate treatment" (emphasis added)); *Lauderdale v. Texas Dep't of Crim. Just.*, 512 F.3d 157, 166 (5th Cir. 2007) ("sexual harassment *in public employment* violates the Equal Protection Clause of the Fourteenth Amendment" (cleaned up) (emphasis added)); *Valentine v. City of Chicago*, 452 F.3d 670, 682 (7th Cir. 2006), as amended (July 6, 2006) ("Sexual harassment by a *state employer* constitutes sex discrimination in violation of the equal protection clause." (emphasis added) (reviewing district court findings to determine whether individual actors could be regarded as supervisors of the city-employee plaintiff)).[15]

---

[15] In *Valentine*, 452 F.3d at 683, the court sought to identify a factual basis for a supervisory role to ensure that the individual defendants reasonably could be regarded as acting under color of law.   The same is true of *Vega*, 801 F.3d at 89.

In any event, Plaintiffs' counsel has not identified any circuit authority that employees of private companies have viable claims under section 1983 against state actors who participate or share in their work activity.  Despite voluminous authority penned on the topic of workplace harassment in violation of equal protection, it has not been made evident to me—my knowledge in this regard should have been supplemented by Plaintiffs' counsel—that, standing alone, verbal sexual harassment by a state actor is actionable absent some further indicia of state supervisory power such as exists with employer-employee and teacher-student relationships.[16]  Stated otherwise, it does not appear to be

---

[16] Of note, the Tenth Circuit relied on such dynamics to conclude that law clearly establishing the unconstitutionality of workplace sexual harassment coupled with a Supreme Court opinion that extrapolated from employment-based sexual harassment law to impose educator liability in the Title IX context was "enough to inform school teachers that sexual harassment which gives rise to a violation of equal protection in the employment context will also do so in the teacher-on-student context." *Sh.A. ex rel. J.A. v. Tucumcari Mun. Sch.*, 321 F.3d 1285, 1289 (10th Cir. 2003).  Perhaps there is a similar combination of precedent that would avail Pike, such that the fact she is not a state employee could be deemed immaterial.  Her counsel has not addressed the matter.  My impression, nevertheless, is that the prospect is only debatable, which is not good enough to overcome the qualified immunity defense.

Seeking cases that blur this line, I did light upon *Jenkins v. University of Minnesota*, 838 F.3d 938 (8th Cir. 2016) (denying fish and wildlife scientist's bid for qualified immunity, but in a circumstance in which he was the plaintiff's "mentor and guide" during her participation in university-sponsored field research).  However, the teacher-student dynamic pervaded the *Jenkins* matter, and the plaintiff was enrolled in a state sponsored educational program.  To like effect, in *Markham v. White*, 172 F.3d 486 (7th Cir. 1999), a group of female police officer trainees overcame the qualified immunity defense of male agents working for a different state agency, but again the teacher-student and state-sponsored program and enrollment features were present.  *See also Borges v. City of Hollister*, No. 5:03-cv-05670, 2005 WL 589797 at *4, *6 (N.D. Cal. Mar. 14, 2005) (granting summary judgment against equal protection claims of city program providers harassed by city's recreation services manager, finding that plaintiffs' employment by outside agencies prevented their claims).

Finally, perhaps it is conceivable that the First Circuit would clarify constitutional law based on factors used to identify joint-employer relationships.  *See, e.g.*, *Lopez v. Massachusetts*, 588 F.3d 69, 85 (1st Cir. 2009) (quoting 2 Equal Emp't Opportunity Comm'n, EEOC Compliance Manual, § 2-III, at 5716-17 (2008)).  Once again, the issue was not argued.  Furthermore, while it is one thing to find joint employment involving two private employers or two public employers, deeming private employees to be de facto employees of state or local government may raise a host of unintended consequences and, by extension, is likely to generate considerable debate among jurists.  In any event, I have not been made aware of precedent that clearly establishes that the joint-employer doctrine is an available tool for imposing liability on state actors on claims brought by employees of private companies that provide contract services to state or local governments.

clearly established that a state actor with supervisory power in the workplace will violate the Equal Protection Clause based on verbal efforts to persuade another person to engage in a sexual relationship when they share a common workspace but the person being propositioned is not a state employee.[17]

To review, Pike's case falls into an uncertain area in which at most there is room for debate about the constitutional implications of Budd's alleged conduct.  On the facts alleged, this is not an "archetypal case . . . . in which a reasonable officer <u>must</u> have known that he was acting unconstitutionally."  *Dirrane v. Brookline Police Dept.*, 315 F.3d 65, 71 (1st Cir. 2002).

The Ninth Circuit recently struggled with a somewhat similar issue in a case that involved sexual harassment at the hands of a social worker assigned to assess a private citizen's application to become the legal guardian of her niece.  There, the Ninth Circuit said the following:

> The district court found the constitutional right not to be sexually harassed by public officials providing social services was not clearly established outside of the workplace or school contexts.  Although we reluctantly agree that this right was not clearly established at the time of [Defendant's] conduct, and therefore Defendants are entitled to qualified immunity in the instant case, we hold that the Equal Protection Clause protects the right to be free from sexual harassment at the hands of public officials providing social services.  . . . Thus, we cannot say that the question raised by [Plaintiff's] claim was "beyond debate" when the conduct as issue occurred here.

---

[17] The work connection, in particular the ability to control the plaintiff's work, is a common thread in section 1983 and Title VII cases.  *See*, *e.g.*, *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) ("Surely, a requirement that a man or woman run a gauntlet of sexual abuse *in return for the privilege of being allowed to work* and make a living can be as demeaning and disconcerting as the harshest of racial epithets." (quoting *Henson v. Dundee*, 682 F.2d 897, 902 (11th Cir. 1982) (emphasis added)).

*Sampson v. County of Los Angeles*, 974 F.3d 1012, 1023-24 (9th Cir. 2020).  The facts of *Sampson* are not squarely on point, but Sampson reflects that the unconstitutionality of harassment perpetrated by state action against someone other than a state employee or public school student is not clearly established by a robust circuit consensus even for state actors who engage in such conduct while they are otherwise engaged in the performance of their state-authorized duties.

Similarly, in *Shepherd v. Robbins*, 55 F.4th 810 (10th Cir. 2022), the Tenth Circuit reviewed the grant of qualified immunity to a police officer who harassed the employee of a private entity that regularly assisted the State of Utah with the provision of commercial towing services.  Although the court determined that qualified immunity was not available to the officer based on his violation of the Fourth Amendment (the officer conducted a traffic stop on the harassed individual), the court upheld the grant of qualified immunity in relation to an equal protection claim arising out of sexual advances made by the officer toward a towing company's employee in communications pertaining to the coordination of towing services.  *Id.* at 816-17.  The court explained that the unconstitutionality of sexual harassment by a state actor was clearly established based on a state actor's "abuse of his governmental authority for the purpose of his own sexual gratification," *id.* at 817, and opined that "the nature and degree of authority a defendant has over a plaintiff informs whether the law is clearly established."  *Id.* at 818.  Ultimately, however, the court held that sexual advances communicated to the towing company's employee did not generate liability that could be regarded as clearly established because the officer's authority in relation to the plaintiff was the product of a commercial relationship between two entities

and did not involve his exercise of any proper state authority over some interest personal to the plaintiff. *Id.* at 819-20.

As with *Sampson*, *Shepherd* tends to hinder rather than help Pike's cause. As alleged, Budd's authority was associated with administration of the drug court, a service that Pike assisted with on behalf of her employer, Wellspring. Perhaps the First Circuit might draw on *Shepherd* to identify distinctions in this case that would favor Pike's claim, but in doing so it would only be establishing law in the first instance, not applying preexisting legal authority that placed the statutory or constitutional question beyond debate in the First Circuit circa 2022.

The viability of a constitutional claim such as Pike's may yet be established in this Circuit, but because it was not clearly established when Budd is alleged to have acted, he is entitled to the dismissal of the case based on the doctrine of qualified immunity.[18]

## CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss is **GRANTED**.

**SO ORDERED.**

Dated this 14th day of June, 2023.

        /s/ Lance E. Walker

        UNITED STATES DISTRICT JUDGE

---

[18] The doctrine of qualified immunity is often criticized due to the tendency of courts to avoid declaring the existence of federal rights before concluding that the rights were not clearly established. *See, e.g.*, Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 CAL. L. REV. 201, 213 (2023). However, as a district judge, I lack the authority to clearly establish the law within the Circuit. Moreover, Plaintiff has not provided me with the building blocks to set forth a clear statement of the law drawn from prior precedent and made applicable to a fact pattern analogous to her own.