# United States Court of Appeals
## For the First Circuit

No. 23-1593

SAMANTHA PIKE,

Plaintiff, Appellant,

NATASHA IRVING,

Plaintiff,

v.

CHARLES F. BUDD, JR., in his individual capacity,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Lance E. Walker, U.S. District Judge]

Before

Gelpí, Howard, and Kayatta,
Circuit Judges.

Sean Ouellette, with whom Shelby Leighton, Public Justice, Laura H. White, and White & Quinlan, LLC were on brief, for appellant.

Susan M. Weidner, with whom Melissa A. Hewey and Drummond Woodsum were on brief, for appellee.

March 28, 2025

**GELPÍ**, **Circuit Judge**. Plaintiff-Appellant Samantha Pike ("Pike"), a licensed alcohol and drug treatment counselor employed by Wellspring, Inc. ("Wellspring"), worked at Maine's Adult Treatment and Recovery Court (TRC), a voluntary treatment and recovery program, in Penobscot County. Defendant-Appellee Charles Budd, Jr. ("Budd") was the presiding judge who oversaw TRC. As the presiding judge, Budd attended an out-of-state, work-related conference alongside other TRC members, including Pike. At that conference, Budd made unwelcome sexual advances towards Pike which then, upon returning to Maine, continued in his chambers at TRC. Pike filed a § 1983 action against Budd, which the district court dismissed, finding that Budd was entitled to qualified immunity because case law did not clearly establish that Budd would violate the Equal Protection Clause in this context. After careful consideration, we conclude that Pike has plausibly alleged a violation of the equal protection right to be free from a hostile work environment and that right is clearly established. Thus, we vacate the dismissal and remand for further proceedings.

## I. Background

### A. Facts[1]

In 2020, Wellspring promoted Pike from counselor to program director, making her the lead treatment provider for TRC.

---

[1] The facts are taken from the second amended complaint as it

Although Pike was directly employed by Wellspring, she was a member of the TRC team. After Pike was promoted, Budd began to bring Boston cream doughnuts for the entire TRC team every Wednesday.

The TRC team consists of trained individuals such as the presiding judge, prosecutor, defense counsel, probation officers, case managers, treatment providers, law enforcement officers, and a coordinator. See State of Me. Jud. Branch, Adult Treatment and Recovery Courts, https://www.courts.maine.gov/courts/treatment/adult.html [https://perma.cc/T7TM-G2FK] (noting that key components of TRC include "[i]ntensive judicial oversight" by the presiding judge and a "[m]ulti-disciplinary treatment team . . . whom have received specialized training"). As alleged in the second amended complaint at issue in this appeal, Pike spent most of her time working on TRC-related matters and appeared before Budd approximately sixteen to twenty-five hours each month. This work included case work for TRC clients and preparing for court-related meetings with the TRC team. The program required frequent meetings with the entire TRC team, including Budd, on a weekly or biweekly basis. Budd supervised the TRC team, entitling him to decision-making authority over certain aspects related to TRC. Budd had the ability to remove members from the team, approve

is "the most recent and most complete version of the pleading" and because each ruling turned on qualified immunity and the sufficiency of the pleading. See Corban v. Sarepta Therapeutics, Inc., 868 F.3d 31, 34 (1st Cir. 2017).

absences from meetings, and decide whether to renew Wellspring's contract with TRC. With respect to Pike, Budd had the capacity to direct her work, remove her from the treatment team, and determine whether her clients would remain in the program. The success of Pike's clients affected her Wellspring performance evaluations.

**1. Conference**

In July 2022, Pike and Budd attended the National Association of Drug Court Professionals Conference in Nashville, Tennessee, which all members of the TRC team were "effectively required" to attend. Prior to the conference, Budd gave Pike his personal cell phone number so that they could reach each other during the conference. Pike and Budd stayed at the same hotel whereas the other TRC members stayed at another.

On the evening of the first day of the conference, Budd and Pike saw each other at a downtown rooftop bar and spoke a few times. At the end of the evening, Budd asked Pike if she would like to share a car back to the hotel. During the car ride, Budd asked her what room she was staying in. After Pike told Budd which room, he responded that he was staying directly across the hall from her. However, Budd's room in fact was on a different floor. When they arrived at the hotel, Budd walked with Pike to the elevator. In the elevator, Budd told Pike she was pretty, which made her feel uncomfortable. They got off the elevator, walked down the hall, and when Pike opened her door, Budd held it open

behind her. Budd said, "Well, I'm not going to come in unless you invite me in." Pike felt unsafe and frightened, did not respond, and backed out of the room into the hallway. Budd invited Pike to have a drink in the lobby. Pike looked in her purse and stated that she did not have her phone or wallet, nervously trying to avoid drinks with Budd. Budd offered to pay for her drink. Then Pike said she did not have her ID on her to which Budd responded he would go to the bar and order for her. She agreed in fear that saying no to Budd would negatively affect her work at TRC.

When they arrived at the lobby bar, Pike immediately went to the bathroom to calm herself down. Budd got the drinks and sat with Pike. Budd told her details about his personal life including his "rocky" marriage, how his wife often accused him of cheating, and that, as a judge, women often sexually propositioned him. Budd told Pike he deletes his text messages, showed her his phone, asked if she thought the deleted messages were strange, and stated that his wife did not like the deleted messages. Budd asked Pike about her personal life, and Pike said she was married with children. Then Budd stated that he thought two of the TRC clients were attractive and that he hoped no one thought he was favoring those two clients, which made Pike feel uncomfortable and that she needed to get away from Budd. This conversation lasted about thirty minutes. Pike told Budd she was tired and would be going

up to her room. She asked Budd if he needed help finding his room and he responded that he knew "exactly" where his room was.

The next day, Pike called her husband to tell him everything that had happened with Budd. Budd texted Pike and asked to share a car to dinner. Pike did not want to ride alone with Budd so she told some of her coworkers what happened and asked them to go to dinner with her so she could avoid Budd. Pike then responded to Budd stating that she was riding with others and that he could meet everyone else at the other hotel. Pike and her coworkers tried to get another judge to go to dinner in the hopes that Budd would not pursue Pike if another judge was present. Later, Budd arrived at the other hotel and stood in the hallway outside a coworker's room and said, in reference to an open suitcase, "I can see your undergarments from here." This caused Pike to feel uncomfortable.

During the dinner, Budd followed Pike around and tried to converse with her. Budd asked Pike where she and everyone else was going and followed them to the bar. Multiple times throughout the night, Budd came up behind Pike and tried to talk to her. Pike felt uncomfortable and asked the TRC probation officer to stay beside her. At one point, Pike stepped outside with the probation officer to discuss Budd's behavior, but Budd followed them outside and stood directly behind Pike. Next, the TRC team went to a line dancing bar. Budd sat next to Pike and stated that she was "much

prettier" than the bartender. Budd followed Pike around the bar and told her not to leave without him, which made her feel uncomfortable given his authority over her on the TRC team. One of Pike's coworkers commented that Budd was following Pike "with his eyes" and that he would pop up behind Pike's shoulder every time she tried to get away from him. So Pike asked some of her coworkers to help her leave unnoticed. Pike pretended to go to the bathroom with her coworkers and left the bar early. Pike texted Budd to let him know she left. Budd texted back, "Can't believe you ditched me." Pike apologized and said it was not intentional. Budd said, "I haven't been ditched in a long time. But I recognize the rhythms. No more Boston creams for you." Pike did not respond.

The next day, Pike went to the conference but skipped the sightseeing tour that the rest of the TRC team did. Budd and Pike did not interact during the rest of the conference. When Pike flew back home, she called Sarah Falvey ("Falvey"), a Wellspring supervisor, to discuss Budd's conduct at the conference. Pike also spoke with Wellspring human resources about Budd.

**2. TRC**

Pike did not go to TRC the week following the conference and asked some coworkers to go in her place. Pike returned to TRC two weeks later accompanied by Falvey at Pike's request. When

Pike walked in, Budd walked over and placed a bag with two Boston cream doughnuts in front of her. Pike and Falvey attended a team meeting together and then Falvey left. Pike remained in the courtroom with a case manager, Ryan Auffant ("Auffant"). Budd walked into the courtroom wearing his judicial robe and summoned Pike to his chambers. Auffant quietly asked Pike if she was going to be okay. Not wanting to cause a scene, Pike went into Budd's chambers alone. In his chambers and while still wearing his robes, Budd said he had been "thinking a lot" about the trip and that he would be "making a lot of changes at home," from which Pike inferred that he was going to leave his wife. Pike believed Budd shared this because he intended to pursue a relationship with her. Pike did not say much and began to exit his chambers. As she was walking out, Budd came up behind her and said, "one more thing. You are a very good listener." Once Pike reached the team meeting area, she broke down in tears. Another case manager asked what had happened and when Pike told him, he told her to leave for the day.

**B. Procedural History**

On November 16, 2022, Pike and Natasha Irving[2] filed a § 1983 claim against Budd alleging that he violated the Equal Protection Clause by engaging in sexually harassing conduct

[2] Irving is not a party to this appeal.

creating a hostile work environment. Pike v. Budd, No. 1:22-cv-00360, 2023 WL 3997267, at *1, *3 (D. Me. June 14, 2023). Budd filed a motion to dismiss raising a qualified immunity defense, which the district court granted on June 14, 2023. Id. at *12. The district court engaged in a color of state law analysis and, assuming without deciding that Pike alleged sufficient facts to state a plausible sexual harassment claim,[3] noted that Budd likely was not acting under color of state law during the conference. Id. at *5-6. Rather, the district court granted the motion to dismiss based on its conclusion that Budd was entitled to qualified immunity because a reasonable official in Budd's position would not have known that his sexual advances towards a private employee violated the Equal Protection Clause. Id. at *5-8. Focusing on the "clearly established" prong of the qualified immunity analysis, the district court determined that Pike's private employment did not put Budd on notice that his conduct was violating a constitutional guarantee. Id. at *9-11. The district court based this on the lack of "circuit authority that employees of private companies have viable claims under section 1983 against state actors who participate or share in their work activity."

[3] The district court did note, however, that assuming Budd had been acting under the color of state law and putting aside the issue of Pike's employment status, "[f]or purposes of ruling on a motion to dismiss, . . . Pike's allegations appear to state a plausible claim of sex-based harassment in the workplace." Pike, 2023 WL 3997267, at *7 n. 9.

Id. at *10. Thus, the district court concluded that, at the time Budd sexually harassed Pike, the law was not clearly established to put Budd on notice that sexually harassing a private employee contracted to provide services to the state violates the Equal Protection Clause. Id. at *10-12.

Pike filed a motion for relief from judgment and motion for leave to amend, both of which the district court denied. Pike v. Budd, No. 1:22-cv-00360, 2023 WL 5431677, at *2 (D. Me. Aug. 23, 2023). Upon review, the district court noted that the qualified immunity analysis hinges on state supervisory authority rather than private employment status. Id. at *1. Yet, the district court determined that its conclusion remained the same because Pike's employment status strongly affects whether Budd would have been on notice that he supervised Pike in their workplace setting. Id. at *2. Pike timely appealed.

## II. Analysis

In the district court, Budd raised three independent arguments in support of his motion to dismiss: (1) that Pike had failed to plausibly allege Budd acted under color of state law; (2) that Pike had failed to plausibly allege she was subjected to actionable sexual harassment under the Equal Protection Clause; and (3) that Budd was entitled to qualified immunity. The district

court resolved the case in favor of Budd on qualified immunity grounds, but the parties contest all three issues on appeal.

**A. Standard of Review**

We review de novo a district court's dismissal for failure to state a claim, including when the dismissal is based on qualified immunity. Ablordeppey v. Walsh, 85 F.4th 27, 32 (1st Cir. 2023) (citing Douglas v. Hirshon, 63 F.4th 49, 54-55 (1st Cir. 2023)). Upon review, we accept the well-pleaded facts from the complaint as true and draw reasonable inferences from those facts in the plaintiff's favor. Burt v. Bd. of Trs. of Univ. of R.I., 84 F.4th 42, 50 (1st Cir. 2023) (citing SEC v. Tambone, 597 F.3d 436, 441 (1st Cir. 2010) (en banc)). To survive a motion to dismiss, the complaint need only state sufficient factual matter to satisfy facial plausibility. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)). Even though post-judgment decisions are reviewed deferentially, we review these decisions de novo when they turn on the same matter of law underlying the motion to dismiss. Corban, 868 F.3d at 34. We begin our discussion with the viability of Pike's § 1983 claim and end with qualified immunity.

**B. Section 1983**

To plead a plausible § 1983 claim, the plaintiff must allege that the defendant acted under color of state law and that the defendant's conduct violated a protected right. Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 45 (1st Cir. 1999); 42 U.S.C. § 1983.

**1. Color of State Law**

"The traditional definition of acting under color of state law requires that the defendant in a [§] 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" West v. Atkins, 487 U.S. 42, 49 (1988) (quoting United States v. Classic, 313 U.S. 299, 326 (1941)). "[S]tate employment is generally sufficient to render the defendant a state actor." Id. (alteration in original) (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 936 n.18 (1982)). "[T]he primary focus of the color of law analysis must be on the conduct of the [official]." Barreto-Rivera, 168 F.3d at 47. "The distinction between private conduct and state action turns on substance, not labels." Lindke v. Freed, 601 U.S. 187, 197 (2024). "It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State." West, 487 U.S. at 49-50. The official's conduct must occur "in the course of performing an actual or apparent duty of his office" or "the

conduct is such that the [official] could not have behaved in that way but for the authority of his office." Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995); see also Lindke, 601 U.S. at 198-99. This inquiry turns on the "nature and circumstances" of the alleged conduct and the "relationship of that conduct" to the official's status or duties. Jakuttis v. Town of Dracut, 95 F.4th 22, 29 (1st Cir. 2024) (quoting Martinez, 54 F.3d at 986). We look to the totality of the circumstances to distinguish private action from state action. See Martinez, 54 F.3d at 987; Zambrana-Marrero v. Suarez-Cruz, 172 F.3d 122, 125-26 (1st Cir. 1999). Private action "outside the line of duty and unaided by any indicia of actual or ostensible state authority, is not conduct occurring under color of state law." Martinez, 54 F.3d at 986-87.

Budd argues that state action is limited by time and setting and since the alleged sexual harassment at the conference occurred after the conference programming had ended each night, there is no state action here. Whether or not this contention would succeed if time and setting were dispositive, time and setting are only factors in our totality of the circumstances analysis. See id. at 987. To the extent that it may be argued that Budd's alleged misconduct at the conference was a "purely personal pursuit[]" rather than state action, Parrilla-Burgos, 108 F.3d at 449 (quoting Martinez, 54 F.3d at 987), the totality of the circumstances yields a different conclusion.

The second amended complaint alleges that Budd was the presiding judge of TRC, plausibly alleging his supervisory relationship to Pike. As the presiding judge, Budd had the authority to make decisions concerning management of the TRC treatment team. This included removing members from the team, approving absences from team meetings, directing Pike's work with TRC, and renewing Wellspring's contract with TRC. Budd also had the authority to decide whether Pike's TRC clients would be removed from the program. Thus, the complaint plausibly alleges that Budd's position as a state court judge provided him with supervisory authority over Pike's work for the TRC. The complaint also alleges that TRC treatment members were expected to attend the conference. Therefore, Budd attended the conference only because of his position as presiding judge, and Pike likewise attended only because it was her duty to do so as a TRC treatment team member. Moreover, as noted, there was a moment on the first night of the conference when Budd commented to Pike that he was often sexually propositioned because he was a judge. His obvious position as a judge, his supervisory authority over Pike because of his judicial position, and his statement to her connecting his judicial position to the availability to him of sexual favors suggest that he was acting under color of state law.

The Eleventh Circuit's decision in Griffin v. City of Opa-Locka, 261 F.3d 1295 (11th Cir. 2001), is instructive. The

court there was faced with a case where a city manager raped a city employee at her apartment following a local Rotary Club meeting. Id. at 1298-300. In considering the state-action issue, the court noted that city employees were expected to attend Rotary Club meetings and pointed to the fact that the city manager had discussed the victim's work for the city on their way to her apartment and continued to invoke his authority over her to harass her after the assault. Id. at 1304. The court thus held that there was evidence from which a reasonable jury could conclude that the city manager was acting under the color of state law when he committed the assault. Id. at 1303.

The circumstances relevant to the state-action analysis here are comparable. Pike has alleged that members of the treatment court team "were expected -- and effectively required --" to attend the Nashville conference. Pike has also alleged that Budd made comments related to their work as they sat in the hotel bar after he attempted to invite himself into her room. And, again as noted, Budd allegedly told Pike that he was often sexually propositioned by women due to his role as a judge and that he hoped the TRC team did not think that he gave favorable treatment towards two of their female clients that he found particularly attractive.

But we needn't go so far as to conclude that, in isolation, the complaint adequately alleges state action at the conference. That is so, because just as it was Pike's and Budd's

work for the TRC that brought them to the conference in Nashville, it was their work for the TRC that brought them to the courthouse back in Maine. Critically, Pike has additionally alleged that Budd invoked his authority over her to continue his harassment when they got back to Maine. Specifically, she reasonably alleges that he summoned her individually to his chambers and made comments there that she understood to mean that he planned on leaving his wife and intended to continue pursuing Pike.

Taken as a whole, these allegations are sufficient to plausibly establish that Budd was acting under color of state law to create a hostile environment for Pike.[4] Cf. Zambrana-Marrero v. Suarez-Cruz, 172 F.3d 122, 127 (1st Cir. 1999) (finding "that a jury reviewing the 'nature and circumstances' of [defendants'] conduct and the 'relationship of that conduct to the performance of [their] official duties,' could conclude that they acted under

[4] In reaching this conclusion, we do not endorse Pike's argument that a state official invariably acts under the color of state law when he sexually harasses someone over whom he exercises supervisory authority. Pike points to no court that has adopted such a rule; to the contrary, we have instructed that "[n]o single, easily determinable factor will control" the state-action inquiry. Zambrana-Marrero v. Suarez-Cruz, 172 F.3d 122, 12 (1st Cir. 1999) (quoting Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 45 (1st Cir. 1999)); see also Lindke, 601 U.S. at 196 ("[T]he state-action doctrine avoids such broad-brush assumptions -- for good reason."). Indeed, Pike conceded below that it would be more difficult to attribute Budd's alleged misconduct to the state if it occurred after he ran into Pike by chance at the grocery store or on vacation.

color of state law, albeit in clear abuse of their authority" (third alteration in original) (quoting Martinez, 54 F.3d at 986)).

### 2. Deprivation of a Federally Secured Right

#### a. Hostile Work Environment Claims Under § 1983

"Although the Supreme Court has never explicitly considered whether sexual harassment violates the Equal Protection Clause, it has long recognized that sex-based discrimination by state actors that does not serve important governmental objectives and is not substantially related to the achievement of those objectives is unconstitutional." Sampson v. Cnty. of L.A., 974 F.3d 1012, 1022 (9th Cir. 2020). Accordingly, in a line of cases considering sexual harassment claims under § 1983, "we have recognized that the analytical framework for proving discriminatory treatment under Title VII is equally applicable to constitutional claims." Lipsett v. Univ. of P.R., 864 F.2d 881, 896 (1st Cir. 1988) (alterations omitted) (quoting White v. Vathally, 732 F.2d 1037, 1039 (1st Cir. 1984)); see Pontarelli v. Stone, 930 F.2d 104, 113–14 (1st Cir. 1991), abrogated on other grounds by Graphic Commc'ns Int'l Union, Loc. 12-N v. Quebecor Printing Providence, Inc., 270 F.3d 1, 4 (1st Cir. 2001); Roy v. Correct Care Sols., LLC, 914 F.3d 52, 61–62 (1st Cir. 2019). Relevant here, Title VII has long been understood to prohibit the

creation of a hostile work environment.[5] See Vance v. Ball State Univ., 570 U.S. 421, 426-27 (2013).

"A hostile work environment is one 'permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" Roy, 914 F.3d at 61 (quoting Harris v. Forklift Sys. Inc., 510 U.S. 17, 21 (1993)). We have set out six elements that a plaintiff must establish in order to succeed on this type of claim:

> (1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

Id. at 62 (quoting O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001)). Our analysis starts with the last of these six elements before turning to the fourth -- the only other one that Budd appears to contest.

[5] Budd gestures at arguing that the standard to allege a hostile work environment under the Equal Protection Clause is more demanding than the standard to allege one under Title VII. While we find nothing in our prior decisions to support this proposition, we deem Budd's argument to be waived for lack of development. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

**b. Individual Liability**

"This case demonstrates how hostile work environment claims . . . under Title VII do not always fit easily within the context of individual liability under § 1983." Raspardo v. Carlone, 770 F.3d 97, 114 (2d Cir. 2014). Most notably, Title VII enables only "employees" to sue their "employers." See DeLia v. Verizon Commc'ns Inc., 656 F.3d 1, 4 (1st Cir. 2011). Here, as Budd repeatedly calls attention to in his brief, Pike was an employee of Wellspring, not the State of Maine. Does that preclude her ability to bring a § 1983 action alleging that Budd violated her equal protection right to be free from a hostile work environment?

We think not. The employer-employee relationship is a crucial part of a Title VII claim because Title VII imposes liability only on "employers." See 42 U.S.C. § 2000e-2(a) ("It shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . . " (emphasis added)); Fantini v. Salem State Coll., 557 F.3d 22, 30 (1st Cir. 2009) ("[T]here is no individual employee liability under Title VII."). That is why our Title VII hostile work environment framework requires that the plaintiff establish "some basis for employer liability." Roy, 914 F.3d at 62 (quoting O'Rourke, 235

F.3d at 728). By contrast, "Congress enacted § 1983 'to enforce provisions of the Fourteenth Amendment against those [individuals] who carry a badge of authority of a State.'" Hafer v. Melo, 502 U.S. 21, 28 (1991) (quoting Scheuer v. Rhodes, 416 U.S. 232, 243 (1974)). It would be a strange result then to bar Pike from bringing her § 1983 claim against Budd solely because she was employed by a non-state entity while leaving the door open for a § 1983 claim by a similarly situated member of the TRC team who happened to be a state employee, such as a prosecutor or probation officer.

We accordingly hold that, when considering a § 1983 hostile work environment claim, the sixth element of our Title VII framework should be replaced with the requirement that a person responsible for the hostile environment acted under color of law: a plaintiff must show, among other things, that some basis for individual liability has been established.

Our decision in Roy supports this approach. The plaintiff in that case worked as a nurse at a Maine state prison while employed by an outside company. 914 F.3d at 56. She alleged that she had been subject to a months-long campaign of sexual harassment by the prison's corrections officers, id. at 57-61, and accordingly sued: (1) her employer under Title VII; (2) the Maine Department of Corrections under the Maine Human Rights Act; and (3) two individuals -- the prison's warden and deputy warden -

- under § 1983, id. at 56. The plaintiff did not claim that either of the two individual defendants had participated directly in the sexual harassment, but rather that they "failed to stop prison staff from sexually harassing her in violation of the Equal Protection Clause." Id. at 72. The case came to us after the district court granted summary judgment to all defendants on all claims. Id. at 56.

We structured our analysis in an intentional fashion. Noting that the plaintiff's "allegation[] that she was subjected to a hostile work environment . . . [was] an essential ingredient of [her] sexual harassment claims against all defendants," we first considered whether "a reasonable jury could find that [plaintiff]'s work environment was hostile." Id. at 61. After concluding that it could, we "proceed[ed] to evaluate the liability of each defendant." Id. at 65.

When we subsequently came to the warden and deputy warden,[6] we did not say that they could not be liable to the plaintiff because they were not her "employer" or because she was not a state employee. Instead, we explained that "[s]upervisors like [the warden and deputy warden] are liable under the Equal Protection Clause for a hostile work environment created by their

[6] We first found that bases existed for a jury to find liable the plaintiff's employer and the Department of Corrections. 914 F.3d at 65, 68. Accordingly, we reversed the district court's decision to grant summary judgment to those defendants. Id.

subordinates in state government only if their 'link' to the unlawful harassment was one of 'supervisory encouragement, condonation, or acquiescence,' or 'gross negligence amounting to deliberate indifference.'" Id. at 72 (quoting Lipsett, 864 F.2d at 902). We went on to hold that, given the steps that the warden and deputy warden had taken to address some of the plaintiff's complaints about sexual harassment, the two individuals were entitled to qualified immunity because "reasonable officials could have believed 'on the[se] facts' that no equal protection . . . violation occurred." Id. at 72-73 (alteration in original) (quoting Dirrane v. Brookline Police Dep't, 315 F.3d 65, 69 (1st Cir. 2002)).

In the instant case, Pike's theory is that Budd is individually liable to her because he personally created a hostile work environment through his persistent advances that she had repeatedly made clear were unwelcome. Unlike the plaintiff in Roy, she is not pursuing a theory of supervisory liability and therefore need not establish any additional "link" between Budd and the unlawful harassment. Furthermore, as we explain below in Part II.C., Budd is not entitled to qualified immunity on this claim.[7]

[7] We discuss Lipsett more in our qualified immunity analysis below but note here that it too supports our conclusion that Pike should not automatically be barred from bringing a § 1983 hostile

Having established that, notwithstanding the fact Pike and Budd did not share an employer, an individual basis exists for Budd's liability under § 1983, we proceed to consider the remainder of Pike's hostile work environment claim.

**c. "Severe or Pervasive so as to Alter the Conditions of Plaintiff's Employment"**

Budd also contends that the alleged conduct was not severe or pervasive because it was verbal rather than physical. However, whether the conduct is physical or verbal is not the linchpin of our inquiry. Sexual harassment may be "physical gestures or verbal expressions." Lipsett, 864 F.2d at 898. The hostility of a work environment "does not depend on any particular kind of conduct[,] . . . [though] behavior like fondling, come-ons, and lewd remarks is often the stuff of hostile environment claims." Billings v. Town of Grafton, 515 F.3d 39, 48 (1st Cir. 2008) (collecting cases). Rather, "[t]he point at which a work environment becomes hostile or abusive" turns on consideration of the surrounding circumstances, including (but not limited to) "the frequency of the discriminatory conduct; its

work environment claim against Budd solely because she does not share his employer. Briefly put, the plaintiff in Lipsett was a resident physician at the University of Puerto Rico School of Medicine who brought, inter alia, a Title VII-like sexual harassment Bivens claim against a doctor at the San Juan Veterans Administration Hospital. 864 F.2d at 884. We reversed the district court's decision to grant summary judgment to the defendant on the claim, even though the plaintiff and defendant did not share an employer. See id. at 912-14.

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (quoting Harris, 510 U.S. at 23).

In reviewing Budd's alleged conduct "from the perspective of a reasonable person in [Pike's] position," we conclude that Pike's complaint plausibly alleges a hostile work environment claim for the purposes of a motion to dismiss. Id. (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)). We start by emphasizing that Budd's position of authority over Pike can be a contributing factor in a jury's determination of severity. See, e.g., Craig v. M & O Agencies, Inc., 496 F.3d 1047, 1056 (9th Cir. 2007) (explaining that while the supervisor's conduct was "physically less threatening" then conduct alleged in other sexual harassment cases, the supervisor's "position as [the plaintiff's] immediate boss made his actions emotionally and psychologically threatening"); Quantock v. Shared Mktg. Serv., Inc., 312 F.3d 899, 904 (7th Cir. 2002) (per curiam) (concluding that a reasonable jury could find conduct sufficiently severe given the harasser's "significant position of authority at the company," the "close working quarters" between him and the plaintiff, and that he had made requests for sex directly to the plaintiff); see also Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 763 (1998) ("[A] supervisor's power and authority invests his

or her harassing conduct with a particular threatening character . . . .").

With this in mind, we cannot agree with Budd's characterization of the alleged conduct as being "exclusively verbal." Of course, allegations of inappropriate comments do form part of the basis for Pike's claim. She alleges that Budd asked her to invite him into her hotel room; shared (unprompted) with her personal issues in his marital life and his receipt of sexual propositions due to his position as a judge; and questioned Pike about her personal life. Budd is alleged to have commented on Pike's physical appearance -- both in private to Pike and in front of her colleagues -- and that of several female TRC clients; and even, while in Pike's presence, said to another female coworker "I can see your undergarments from here."[8]

However, these comments were not made in isolation but could be viewed by a jury as part of a mosaic of physically intimidating behavior. Significantly, Pike claims that Budd's untoward behavior began with him lying about the location of his hotel room in an endeavor to follow Pike to her room. When Pike

[8] "Evidence of the harassment of third parties can help to prove a legally cognizable claim of a hostile environment." Hernandez-Loring v. Universidad Metropolitana, 233 F.3d 49, 55 n.4 (1st Cir. 2000). It is therefore relevant here, in reviewing a motion to dismiss, that Pike alleges "Budd has a reputation for flirting with clerks," and "show[ing] favoritism toward[s] young, attractive, female drug court clients."

opened the door to her room, Budd allegedly stood close enough behind her to reach around and hold the door into her room open before he suggested he be invited in. Not wanting to invite him in, Pike backed into the hallway whereupon, she claims, Budd repeatedly asked her to join him for a drink. Given Budd's presence outside her hotel room door, his attempt to enter her room, and his refusal to accept her objections to going downstairs with him, at this stage we cannot say that no jury could find it reasonable for Pike to feel "cornered and like she needed to get out of the hallway with Judge Budd and get him away from her room."

This interaction is relevant to the analysis for several reasons. First, we think that the intimidating nature of the event colors how a reasonable person could perceive the alleged inappropriate comments made by Budd described above. Additionally, it tends to establish a trend of potentially intimidating and, frankly, creepy behavior. At the next night of the conference, Budd allegedly followed Pike around at dinner and then to bars. Pike claims that Budd came up behind her "on multiple occasions," and when she went outside with a male coworker to discuss the judge's behavior, Budd followed her outside and again stood right behind her. His alleged pursuit was so persistent that a coworker stated that Budd was watching Pike throughout the night and "he would pop up behind Mrs. Pike's shoulder every time she tried to get away from him."

Further, a jury could find that the sexual advances and physically intimidating behavior did not end at the conference. Pike alleges that the next time she saw Budd, two weeks later, he used his position of authority to get Pike alone his chambers, alluded again to a pursing a sexually relationship with her, and came up behind her when Pike attempted to leave. Taking these asserted claims as true, we cannot say that Budd's alleged physically intimating behavior combined with his repeated sexual advances is insufficiently severe to state a claim for sexual harassment. See Cruz v. Coach Stores, Inc., 202 F.3d 560, 571-72 (2d Cir. 2000) (finding that the "physically threatening nature of [the harasser's] behavior," which consisted of standing very close to women, looking them up and down in an uncomfortable way, and "repeatedly ended with him backing [the plaintiff] into the wall until she had to 'cut the conversation short' in order to extricate herself, brings this case over the line separating merely offensive or boorish conduct from actionable sexual harassment") superseded on other grounds by N.Y.C. Local L. No. 85.

To be sure, Budd's alleged conduct here was not as long-lasting or openly antagonistic as some cases where we have allowed hostile work environment claims to proceed. See, e.g., Xiaoyan Tang v. Citizens Bank, N.A., 821 F.3d 206, 211-13, 217-18 (1st Cir. 2016) (over the course of several months, supervisor repeatedly made inappropriate remarks about Asian women to Chinese

plaintiff, made sexual advance during performance review, and eventually became angry and aggressive after it became clear that plaintiff was not interested). Importantly, Budd's alleged cornering of Pike at the entrance to her room, in a hotel far from home, followed by his persistent and repeated tailing of Pike was more disconcerting than the conduct we have found to create a triable hostile work environment claim in the past. See id. at 41–42, 50 (supervisor would routinely stare at plaintiff's chest while speaking with her over the course of multiple years and once told another employee that plaintiff was "under [his] desk" when asked where she was); Vera v. McHugh, 622 F.3d 17, 21–22, 29 (1st Cir. 2010) (supervisor and plaintiff shared a small office for approximately three months where he would sit staring at her and move his chair close so that their legs would touch); Hernandez-Loring v. Universidad Metropolitana, 233 F.3d 49, 55 (1st Cir. 2000) (supervisor repeatedly asked plaintiff to go on a date and used suggestive language towards her and others in workplace).

Also important is the degree to which Pike alleges that Budd could have -- and did -- impact her employment with Wellspring. To wit, she alleges that Budd had the authority to remove members from the TRC team and that, if he had decided to remove her from the team, it would have eliminated approximately seventy-five percent of her job responsibilities for Wellspring. Pike also alleges that Budd had the authority to decide whether

TRC would renew Wellspring's contract. Set against this backdrop, it is logical that harassment from Budd would have had a greater impact on Pike's work than harassment coming from a less influential member of the TRC team. Indeed, Pike alleges that Budd's misconduct caused Pike to avoid TRC after the conference, ask Falvey to attend TRC alongside her when she would normally attend alone, prompted her to skip a court appearance, and led a coworker to suggest that she leave early one day.

The strongest counter that Budd can muster is our decision in Ponte v. Steelcase Inc., 741 F.3d 310 (1st Cir. 2014). There, the plaintiff brought a Title VII claim against her former employer alleging, among other things, that her direct supervisor had sexually harassed her to the point of creating a hostile work environment. Id. at 313. Specifically, the plaintiff alleged that, while attending an out-of-state corporate training, her supervisor twice insisted on giving her a ride back to her hotel room after dinner with other employees. Id. at 314. On the first ride, the supervisor put his arm around the plaintiff for about a minute, and "emphasized to [the plaintiff] that he had done a lot to get her this job, and that she owed him to do 'the right thing by him.'" Id. On the second ride, the supervisor again put his arm around the plaintiff, this time for the majority of the fifteen-to-twenty-minute drive. Id. The plaintiff had been employed at the company for approximately a month when these events

occurred and was terminated approximately eleven months later. Id. at 313, 319. She did not allege that harassment took place on any other occasion. Id. at 314. We affirmed summary judgment for the former employer, reasoning in relevant part that "no reasonable juror could conclude that the two incidents [in the car] were severe or pervasive enough to create a hostile work environment." Id. at 319-21.

But Ponte can be distinguished. For starters, Ponte was decided on summary judgment, not a motion to dismiss. Moreover, the Supreme Court has emphasized the importance of the subjective impact on the plaintiff of a defendant's alleged harassment. See Faragher v. City of Boca Raton, 524 U.S. 775, 777 (1998) (noting the requirement that "a sexually objectionable environment must be both objectively and subjectively offensive); Harris v. Forklift Sys., Inc., 510 U.S. 17, 22-23 (1993) (holding that "the victim [must] subjectively perceive the environment to be abusive" but need not actually suffer "concrete psychological harm"). In Ponte, the plaintiff made no allegation that the supervisor's conduct created anything more than momentary "discomfort"; importantly, she also made no claim that the challenged conduct affected her ability to pursue her job or maintain her work performance. 741 F.3d at 320. Here, by contrast, Pike alleges in detail how Budd's allege conduct negatively and directly impacted her performance. Ponte thus does not persuade us that Pike has failed to allege

that she was subjected to actionable sexual harassment under the Equal Protection Clause.

Therefore, considering Budd and Pike's shared work setting and his authority over her as TRC's presiding judge,[9] in combination with his alleged misconduct, we conclude that Pike's complaint sufficiently portrays a state-empowered supervisor who crossed the line from merely making uncomfortable and inappropriate comments to one who engaged in sexual harassment. See Vera, 622 F.3d at 27-28 (noting that the shared workspace coupled with the defendant's inappropriate practices of staring and drawing close to the plaintiff amounted to an actionable hostile work environment claim).[10]

**C. Qualified Immunity**

Qualified immunity protects reasonable government officials from civil liability when their conduct does not violate clearly established constitutional or statutory rights. Pearson v. Callahan, 555 U.S. 223, 231 (2009). But qualified immunity

[9] This is not to say that a presiding judge, such as Budd, could be considered to alter the conditions of employment of all who appeared before him, such as a lawyer who occasionally appeared before Budd or a security officer who briefly interacted with Budd.

[10] In reaching this outcome, we rely -- as we must -- on the fact that this issue arises on a Rule 12(b)(6) motion. Under that rule, we address only the "plausibility" of plaintiffs' allegations. Ashcroft, 556 U.S. at 679. Moreover, we draw all reasonable inferences in favor of the plaintiff. See Burt, 84 F.4th at 50.

does not protect "the plainly incompetent or those who knowingly violate the law." District of Columbia v. Wesby, 583 U.S. 48, 63 (2018) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). Rather, qualified immunity strikes a balance between individual constitutional rights and officials' duties. Souza v. Pina, 53 F.3d 423, 425 (1st Cir. 1995).

To determine whether the applicable law is well established, we inquire into (1) the clarity of the law at the time of the alleged violation and (2) whether a reasonable official, under the facts presented, would have understood that his conduct violated a constitutional right. Glik v. Cunniffe, 655 F.3d 78, 81 (1st Cir. 2011). While we do not need a case directly on point, "precedent must have placed the . . . constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011); Ablordeppey, 85 F.4th at 33 (noting that "controlling precedent or a consensus among persuasive authority" will suffice). "[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very [conduct] in question has not previously been held unlawful.'" United States v. Lanier, 520 U.S. 259, 271 (1997) (second alteration in original) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)); Hope v. Pelzer, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates

established law even in novel factual circumstances."). All that is needed for a constitutional right to be clearly established is that it "be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640; Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982) (clarifying that if "an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate"). That being said, the particular conduct's violative nature must be clearly established in light of the specific facts alleged. Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam); Anderson, 483 U.S. at 641 (explaining that violations within a specific context should "follow immediately" from clearly established principles).

**1. Clearly Established Right**

Budd argues that there is no controlling case law from the Supreme Court nor within our circuit that clearly establishes that an official in Budd's position who engages in his particular conduct in a shared work setting violates the Equal Protection Clause. Budd also asserts that there is no consensus of persuasive out-of-circuit authority that clearly establishes the same. We disagree.

In our circuit, it is clearly established that a state actor violates the Equal Protection Clause upon creating a hostile work environment. Clearly established law instructs that sexual

discrimination violates the Equal Protection Clause, see Reed v. Reed, 404 U.S. 71, 76-77 (1971); that discriminatory treatment standards under Title VII are equally applicable to an equal protection claim, see White v. Vathally, 732 F.2d 1037, 1039 (1st Cir. 1984); that on-the-job sexual harassment "is actionable under [Section] 1983 as a violation of the equal protection clause," see Pontarelli v. Stone, 930 F.2d 104, 113 (1st Cir. 1991); that the "accumulated effect" of repeated verbal harassment in the workplace may reasonably constitute sexual harassment, see Rosario v. Dep't of Army, 607 F.3d 241, 247 (1st Cir. 2010) (quoting O'Rourke, 235 F.3d at 729); and that if a "state official directly engage[s] in sexual harassment or sexual discrimination, he would, of course, be subject to section 1983 liability," Lipsett, 864 F.2d at 901.

Budd then argues that Lipsett fails to provide notice to him because in that case: (1) the § 1983 equal protection claim was brought against supervisors responsible for managing the medical residency program, (2) it was not determined whether the only defendant who directly harassed the plaintiff could be sued under § 1983, and (3) only a quid pro quo theory was addressed. Each of these aspects, which Budd believes did not provide him with fair warning that sexually harassing Pike would violate her equal protection right to be free from a hostile work environment, misses the mark.

In Lipsett, a student-employee in a medical residency program brought a sexual discrimination claim against supervisors for the sexually harassing conduct of subordinates and against an individual doctor for his direct sexual harassment under the Equal Protection Clause and Title VII. Id. at 896. There, the court's decision to not thoroughly address whether the individual doctor could be sued under § 1983 was due to uncertainty as to whether the defendant could be considered a state actor for the purposes of § 1983. Id. at 912 n.32. No such issue exists here. And the fact that supervisor liability was at issue under § 1983 does not fail to put Budd on notice that an official who directly sexually harasses another in a workplace setting would be subject to a § 1983 suit. Id. at 881, 901. Lipsett unambiguously states that an official who sexually harasses an employee within the workplace is on notice that they may be sued under § 1983. Id.

Furthermore, the technicality that quid pro quo rather than hostile work environment was at issue in Lipsett likewise does not fail to put Budd on notice. For the "clearly established" analysis, we look to whether clearly established principles would provide notice that the particular conduct in the specific context before us would put a reasonable official on notice that such would amount to a violation of a constitutional right. While the particular conduct and specific context of the case are necessary to the "clearly established" analysis, such aspects will not limit

the applicability of a clearly established principle if it logically follows with obvious clarity that the official's conduct would violate that principle. Where we explained in Lipsett that "the disparate treatment standard of Title VII applies as well to claims arising under the equal protection clause" and explained that sexual harassment under Title VII was actionable under a quid pro quo or hostile environment theory of liability, it clearly follows that a state actor would be on notice that he may be sued under § 1983 for creating a hostile work environment. See id. at 898-97.

Budd relatedly argues that Lipsett, alongside Pontarelli, only provides notice that employers may be liable, pointing to the lack of a traditional employer-employee relationship between him and Pike. But as we have explained, due to the unique shared work setting, Pike's role as a TRC counselor, and Budd's role as the presiding judge over TRC, the context of Pike and Budd's working relationship is akin to an employee-employer relationship such that clearly established principles would put Budd on notice that his sexually harassing conduct would amount to a constitutional violation of equal protection rights.[11] See also Shepherd v. Robbins, 55 F.4th 810,

---

[11] Due to this supervisor-like relationship, we decline to discuss the employee-private contractor distinction in City of Richmond v. J.A. Croson Co., 488 U.S. 469 (1989), and O'Hare Truck

818 (10th Cir. 2022) (emphasizing that "the nature and degree of authority a defendant has over a plaintiff informs whether the law is clearly established"). In any event, we reject Budd's argument that he was not on notice that he could be held liable where he was not Pike's employer, for several reasons.

First, the fact that the defendant in cases asserting statutory liability for employers are usually employers offers no reason to suppose in the first instance that a defendant must be an employer in a case alleging a Fourteenth Amendment claim.

Second, it is certainly well established that a state actor who creates a hostile environment in the workplace, on the basis of sex, violates the law. See Starnes v. Butler Cnty. Ct. of Common Pleas, 971 F.3d 416, 428 (3d Cir. 2020) ("[A] robust consensus of persuasive authority exists to clearly establish that creating a hostile work environment constitutes a § 1983 violation."). And as we have explained, given the occasion on which Budd mistreated Pike, his reference to a connection between his status as a judge and sex, and his use of his authority in the courtroom and chambers, any regular judge would have easily known that using his authority to harass on the basis of sex someone

Serv., Inc. v. City of Northlake, 518 U.S. 712 (1996), which involved discrimination based on race and political affiliation, respectively.

whose employment he controlled violated his status under the Fourteenth Amendment.

The parties also debate whether it was clearly established that Budd was reasonably viewed as Judge Budd, who presided over the TRC, rather than private citizen Charles Budd, when he repeatedly demonstrated his interest in Pike. But Pike convincingly establishes that, in general, § 1983 liability turns on the state power wielded by defendant, not, as we have already discussed, on whether the defendant is plaintiff's employer or formal supervisor. See, e.g., Johnson v. Martin, 195 F.3d 1208, 1218 (10th Cir. 1999) (holding that it was clearly established that "to abuse any one of a number of kinds of [state] authority," including a building permitter sexually harassing permit applicants, would constitute state action); Dan Vang v. Vang Xiong X. Toyed, 944 F.2d 476, 780 (9th Cir. 1991) (finding that a state official who worked for a job placement agency engaged in state action when he sexually harassed job seekers who came to him for assistance); Hayut, 352 F.3d at 744 (holding that a professor at a state university acts under color of state law when he "misuses [his] authority [over students] in the course of performing his duties," such as grading and teaching).

To locate the necessary state power in an employment context, courts have, as a shorthand, looked to "the substance of the individual defendant's job functions, rather than the form, to

determine whether an employee was acting in a supervisory capacity." Zelinski v. Pa. State Police, 108 F. App'x 700, 703 (3d Cir. 2004); see also Bonenberger v. Plymouth Tp., 132 F.3d 20, 23 (3d Cir. 1997) ("There is simply no plausible justification for distinguishing between abuse of state authority by one who holds the formal title of supervisor, on the one hand, and abuse of state authority by one who bears no such title but whose regular duties nonetheless include a virtually identical supervisory role, on the other."); Markham v. White, 172 F.3d 486, 491-92 (7th Cir. 1999) (assuming that training seminar instructors employed by the Drug Enforcement Agency exercised state authority when they sexually harassed female police officers while training them and finding that the instructors violated equal protection as a matter of clearly established law, though the police officers worked for a different employer); David v. City and Cnty. of Denver, 101 F.3d 1344, 1354 (10th Cir. 1996) (acknowledging that co-employees would be liable for sexual harassment under § 1983 to the extent they "in some . . . way exercised state authority over [plaintiff]").

But, at bottom, we think it clearly established that § 1983 liability requires a state actor to hold some power over the plaintiff whose rights he violates. And the fact that no case involves a judge sexually harassing a subordinate who reports to a separate, private employer does not excuse a reasonable official in Budd's place from realizing that his conduct would not pass

muster under the Constitution. See Hope, 536 U.S. at 741 ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."). Here, Budd clearly acted as Judge Budd, who had significant power over Pike as a counselor working in his courtroom, when he committed the alleged conduct.

As a final note, on appeal Budd argues only that his conduct was not sufficiently severe or pervasive for Pike's claim to survive a Rule 12(b)(6) motion. Budd nowhere argues it is not clearly established that his conduct was not severe or pervasive. In any event, our prior decision in Vera certainly put Budd on notice that repeatedly "drawing inappropriately close" to a subordinate in such a way as to "violate [the subordinate's] privacy and the integrity of her personal space" can provide the basis for a triable claim of sexual harassment.[12] 622 F.3d at 27.

[12] Notably, we are not the only circuit to recognize that invading an individual's physical space can create a hostile environment in certain circumstances. In vacating a grant of summary judgement in favor of an employer, the Second Circuit in Cruz found that the plaintiff had shown a triable issue of sexual harassment due to a hostile work environment under Title VII. Cruz, 202 F.3d at 570. The supervisor in question allegedly stated "that woman should be barefoot and pregnant," stood very close to women when talking to them, "look[ed] at [them] up and down in a way that's very uncomfortable," and on some occasions, backed the plaintiff almost into a wall "until she had to 'cut the conversation short' in order to extricate herself." Id. at 571. The Second Circuit described this behavior as "physically threatening" so as to "bring[] this case over the line separating merely offensive or boorish conduct from actionable sexual harassment." Id.

In Vera, the plaintiff alleged that the supervisor with whom she shared her office space "stared at her in a sexual way, came so close to her that she could feel his breath, pulled his chair next to her so that their legs touched, laughed at her discomfort, blocked her escape from the cramped office with a closed door, and on one occasion called her 'Babe.'" Id. We explained that even though the parties had only shared an office for a "relatively short duration," a jury could find that "the intensity and frequency" of the conduct at issue could alter the conditions of the plaintiff's employment. Id. at 29.

As explained above, Budd is alleged to have repeatedly made unwelcome and intimidating sexual advances towards Pike at the work conference and in chambers, including by repeatedly standing uncomfortably close behind her, watching her, cornering her at the threshold of her hotel room, and commenting on her and other females' appearances. It naturally follows from Vera that a jury could conclude Budd's conduct was "so objectively offensive that a reasonable person would find it to be hostile or abusive." Id. at 29. That the conduct at Vera occurred over the course of three months does not negate its application to this case. As we noted there, "[a]lthough [the supervisor] did not overtly threaten [the plaintiff], the allegation that he blocked her from leaving the office [by closing a door] on at least one occasion suggests a physically threatening environment." Id. at 28 (emphasis added).

Budd, therefore, was on notice that cornering Pike outside her hotel room where her only way to leave the situation would be to join him for a drink could reasonably be viewed by a jury as creating a threatening environment -- one that is even more severe than that alleged in Vera given the proximity of the alleged sexual advance to a hotel room.

Moreover, we are convinced by the consensus of binding and persuasive authority referenced above that Budd was on notice that his position of authority over Pike could further contribute to the coerciveness of his actions, see Burlington Indus., 524 U.S. at 763; Craig, 496 F.3d at 1056, even when the alleged hostile conduct is limited in number, see Quantock, 312 F.3d at 904. In summary, being that Budd was a state judge who repeatedly made unwelcome and intimidating sexual advances towards Pike, he would have reasonably known that such conduct falls within the realm of our clearly established principles. Accordingly, Budd would be hard pressed to assert that he was unaware that his unwelcome sexual advances towards Pike would violate her equal protection right to be free from a hostile work environment.[13]

[13] While we disagree with Budd's characterization that the alleged conduct was "entirely verbal," we do note that unwelcome verbal sexual advances can present a trial-worthy claim of sexual harassment if they are persistent. For example, in Hernandez-Loring, we vacated the dismissal of a hostile environment claim at summary judgement where a professor had alleged, "[w]ithout being specific as to dates," that the head of her promotion committee

Qualified immunity is a "good faith" immunity involving the presumptive knowledge and respect for "basic, unquestioned constitutional rights." Harlow, 457 U.S. at 815 (quoting Wood v. Strickland, 420 U.S. 308, 322 (1975)). If intentional discrimination has occurred, then "good faith" immunity is logically excluded. Goodwin v. Cir. Ct. of St. Louis Cnty., 729 F.2d 541, 546 (8th Cir. 1984). Therefore, at the time Budd allegedly made his unwelcome sexual advances to Pike, a reasonable official in his position would have known that such conduct would violate the equal protection right to be free from a hostile work environment.

## III. Conclusion

In summary, it is clear that the Fourteenth Amendment prohibits state actors from employing their authority to discriminate on the basis of sex. See Sampson, 974 F.3d at 1022-23 (listing cases). It is equally clear that creating a hostile environment in the workplace on the basis of sex is one form of sex discrimination. See, e.g., Meritor Sav. Bank, FSB v. Vinson,

"repeatedly asked her for dates and used suggestive language toward her" and was "known to have used suggestive and offensive language to students in class." 233 F.3d at 55-56. Where here Budd is alleged (together with the intimidating conduct discussed at length above) to have a "reputation for flirting with clerks," "show[ing] favoritism toward[s] young, attractive, female drug court clients," making several unwelcome advances towards Pike in a short amount of time, and commenting on a female co-worker's underwear, we cannot say Budd was without notice that his actions may have violated Pike's equal protection rights.

477 U.S. 57 (1986). Thus, as we have previously spelled out, a state actor who employs his or her state authority to create a hostile work environment in the workplace violates the Fourteenth Amendment. See Lipsett, 864 F.2d at 896-98, 901 ("If . . . a state official directly engaged in sexual harassment or sexual discrimination, he would, of course, be subject to [§] 1983 liability."). As we have explained, Budd is alleged to have done just that. As a result, even though we do not have a prior case on all fours with this one, cases that clearly establish each of the above elements suffice. See Hope, 536 U.S. at 741 ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.").

For the foregoing reasons, we **vacate** the district court's grant of dismissal for Budd based on qualified immunity and **remand** for further proceedings in light of this opinion. Costs are taxed in favor of the appellant.