UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| SAMANTHA PIKE, | ) |
|         Plaintiff, | ) |
| v. | ) Case No. 1:22-cv-00360-LEW |
| CHARLES F. BUDD, JR., | ) |
| in his individual capacity, | ) |
|         Defendant | ) |

**SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Samantha Pike, by and through her undersigned counsel, hereby complains against Defendant Charles F. Budd, Jr. as follows:

**INTRODUCTION**

1. This is a 42 U.S.C. § 1983 civil rights action for damages arising from Judge Charles F. Budd, Jr.'s unconstitutional sexual harassment of Plaintiff as her supervisor on a drug and alcohol treatment team in Maine District Court.

2. Until recently, Judge Budd oversaw the Maine District Court's Adult Treatment and Recovery Courts ("treatment court"). In his position of immense authority as not only a judicial officer but also the leader of the treatment court and Mrs. Pike's supervisor, Judge Budd subjected Mrs. Pike to discrimination based on her sex that is actionable under 42 U.S.C. § 1983, including unwelcomed sexual advances that created a hostile work environment in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## THE PARTIES

3. Plaintiff Samantha Pike ("Mrs. Pike") is an individual residing in the Town of Hermon, County of Penobscot, and State of Maine. Mrs. Pike was employed as a Program Director of Outpatient Substance Use Disorder Services at Wellspring, Inc. ("Wellspring"), an addiction treatment center in Bangor, Maine.

4. Defendant Charles F. Budd Jr. ("Judge Budd") is a Maine District Court judge who, upon information and belief, resides in the City of Bangor, County of Penobscot, and State of Maine. Judge Budd is sued in his individual capacity.

## JURISDICTION AND VENUE

5. The Court has federal subject matter jurisdiction over this 42 U.S.C. § 1983 action under 28 U.S.C. §§ 1331 and 1343.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## FACTS

**A. Mrs. Pike's Role on the Treatment Court Team under Judge Budd's Supervision**

7. Mrs. Pike is a successful, talented, and dedicated mental health professional. She is a licensed alcohol and drug counselor ("LADC") and a certified clinical supervisor. Mrs. Pike began working for Wellspring as a treatment court counselor in February of 2018. As part of her job duties, Mrs. Pike served on a multidisciplinary team in the Maine drug and alcohol treatment court.

8. "Treatment court" is a specialty docket of the Maine District Court that provides treatment and recovery opportunities for eligible individuals whose involvement with the criminal justice system is fueled by a serious substance use disorder. Individuals are admitted to the treatment court after entering into a plea

1

agreement and accepting responsibility for their criminal conduct.

9. Treatment court is a voluntary program that involves a multi-disciplinary treatment team, which includes the presiding judge, prosecutor, defense counsel, probation officers, case managers, treatment providers, law enforcement officers, and a coordinator. Each of these individuals receives specialized training in their role as part of the treatment court team.

10. Treatment court may also include comprehensive, individualized treatment plans, community supervision, case management to assist with scheduling, housing, and employment, drug testing, strict accountability and sanctions for noncompliance, and incentives for compliance that include successful completion of the program as part of a plea agreement. The treatment court program is rigorous and requires frequent meetings with the presiding judge and treatment court team on a weekly or biweekly basis.

11. Mrs. Pike first met Judge Budd in his role as the presiding judge for the treatment court more than four years ago.

12. As the presiding judge, Judge Budd had the ultimate authority to make decisions concerning the management of the team and its personnel.

13. Judge Budd had authority to remove members of the team, approve or disapprove absences from team meetings, direct Mrs. Pike's work, and decide whether the treatment court renewed Wellspring's contract.

14. If Judge Budd had decided to fire Pike from the team, it would have eliminated approximately 75 percent of her job responsibilities and likely precipitated her termination from Wellspring.

15. Judge Budd also had controlling influence over whether Wellspring remained the court's treatment provider. During the events described below, Wellspring was in the process of bidding to continue as the treatment provider for the court, in competition with other service providers.

16. If Judge Budd decided the court should not continue its relationship with Wellspring and cited Mrs. Pike as the reason, she would have almost certainly lost her job at Wellspring. At minimum, Mrs. Pike would have lost the bulk of her clients and job duties.

17. Judge Budd also had final and unfettered decision-making authority over Mrs. Pike's clients in the treatment court: he could revoke their probation or remove them from the program as he deemed appropriate.

18. Whether Mrs. Pikes' clients were successful in the treatment court program in turn impacted Mrs. Pike's performance evaluations.

19. Mrs. Pike spent roughly 16-25 hours per month in treatment court appearing before Judge Budd. She spent approximately three-fourths of her work hours on work related to the treatment court, including doing case work for her treatment court clients and preparing for meetings and appearances.

**B.    Judge Budd Sexually Harasses Mrs. Pike at a Work Conference**

20. Based on her excellent work history, Wellspring promoted Mrs. Pike to program director of outpatient substance use disorder ("SUD") services in 2020.

21. In her new role, Mrs. Pike became the lead treatment provider for the treatment court in Penobscot County.

22. After Mrs. Pike became the lead treatment provider on the team in

Penobscot County, Judge Budd began bringing her and other members of the team Boston cream donuts on Wednesdays.

23. When Mrs. Pike first met Judge Budd, a male employee of Wellspring was the lead on the treatment court team. Judge Budd did not bring in Boston cream donuts for this male Wellspring employee.

24. From July 25-28, 2022, Mrs. Pike and other members of the treatment court team, including Judge Budd, attended the National Association of Drug Court Professionals (NADCP) Conference in Nashville, Tennessee.

25. Members of the treatment team were expected—and effectively required—to attend the conference. All members of the team attended.

26. On July 20, 2022, Judge Budd provided Mrs. Pike with his personal cell phone number so they and other members of the treatment court team could get dinner.

27. On the morning the conference began, Monday, July 25, 2022, Mrs. Pike saw Judge Budd in the hotel and said hello.

28. On the evening of July 25, 2022, Mrs. Pike saw Judge Budd again after the program ended for the day in a downtown rooftop bar.

29. Judge Budd chatted with Mrs. Pike a few times throughout the evening, and she noted that he seemed more talkative than usual.

30. Both Judge Budd and Mrs. Pike were staying at a hotel called the Gaylord. Other members of the treatment court team were staying at a different hotel called the Bode.

31. Toward the end of the evening at the rooftop bar, Judge Budd asked

4

Mrs. Pike if she would like to share an Uber or Lyft back to the Gaylord. She said yes, preferring for safety purposes to ride with someone she knew over making the trip back to the hotel alone.

32. In the car on the ride home, Judge Budd asked Mrs. Pike what room she was in, and she told him. Judge Budd responded, "Oh really? I'm directly across the hall from you."

33. Mrs. Pike walked with Judge Budd to the elevator when they returned to the Gaylord. As they got on the elevator, Judge Budd commented on how pretty he thought Mrs. Pike was. She instantly felt extremely uncomfortable.

34. When Mrs. Pike and Judge Budd got off the elevator, they both walked down the hall to what she believed was their separate rooms across from each other. However, Judge Budd did not go into a hotel room of his own.

35. Mrs. Pike opened her hotel room door and Judge Budd held it open behind her. He then said: "Well, I'm not going to come in unless you invite me in." This comment made Mrs. Pike feel not only uncomfortable but unsafe and frightened.

36. Mrs. Pike did not know what to say in response to Judge Budd, but she did not invite him into her room or even enter the room. His sexual advance and request to be invited into her room was obviously unwelcome based on her body language. Mrs. Pike nervously backed out of her hotel room into the hallway.

37. It was clear from her response that Mrs. Pike did not want Judge Budd to come into her room, and it was clear that Judge Budd did not have his own room on that floor. Judge Budd asked Mrs. Pike if she wanted to go back

5

down to the lobby and have another drink. Mrs. Pike felt uncomfortable and fumbled around in the hallway for her phone and wallet in her purse. But she did not want to offend Judge Budd given his authority over her as her supervisor in the treatment court. She tried to get out of the situation by saying nervously: "I would, but I cannot find my phone or wallet."

38.  Judge Budd told Mrs. Pike it was fine; he would buy her a drink. Mrs. Pike tried to get out of the situation again and responded: "Well, I don't have my ID, so they aren't going to serve me." Judge Budd said that he would go up to the bar and order the drinks.

39.  Mrs. Pike felt cornered and like she needed to get out of the hallway with Judge Budd and get him away from her room. She also feared that rejecting Judge Budd would have negative consequences for her job given Judge Budd's role as her supervisor. So she agreed to go downstairs with him for a drink.

40.  Once in the lobby bar, Mrs. Pike immediately went to the bathroom where she had to calm down and stop herself from crying.

41.  Judge Budd got drinks at the bar and then sat down with Mrs. Pike. He began talking about his home life.

42.  Judge Budd said that his marriage was "rocky," and his wife often thought he was cheating on her.

43.  Judge Budd told Mrs. Pike that he was often sexually propositioned by women due to his role as a judge.

44.  Judge Budd showed Mrs. Pike his cell phone and the fact that all of his text messages were deleted.

6

45. Judge Budd asked Mrs. Pike if she thought it was strange that he deleted all of his text messages and confided that his wife did not like this.

46. This conversation lasted approximately 30 minutes, during which time Judge Budd repeatedly asked Mrs. Pike to tell him more about herself. Mrs. Pike stated clearly that she was happily married and had two children.

47. Judge Budd then commented that he found two of their mutual treatment court clients extremely attractive, and he hoped the rest of the team did not think he was favoring these attractive female treatment court clients.

48. Mrs. Pike felt sick to her stomach, immensely unsafe and uncomfortable, and that she needed to get away from Judge Budd immediately.

49. Mrs. Pike told Judge Budd that she was tired, and she needed to go back up to her room. Knowing by that point that Judge Budd's room was not in fact across from hers, Mrs. Pike asked if he needed help figuring out where his room was.

50. Judge Budd responded, "Oh no, Ms. Pike. I know exactly where my room is." Judge Budd was smirking and almost chuckled as he made this statement.

51. Mrs. Pike had confirmation that Judge Budd lied to her about having a room across from hers so that he could get Mrs. Pike alone upstairs and then enter her hotel room.

52. Mrs. Pike immediately left the bar and called her husband the next morning to confide in him about how upset she was.

53. Around 3:45 pm that next day, Mrs. Pike received a text from Judge

7

Budd asking her to share an Uber or Lyft to go downtown for dinner.

54. Mrs. Pike told two of her coworkers from Wellspring how uncomfortable the above events made her. She asked these coworkers to wait for her to come to their hotel and then go to dinner together so she would not have to ride alone with Judge Budd.

55. At 4:42 pm, Mrs. Pike responded to Judge Budd that she was heading to dinner "with the girls" and said he could meet them all at the Bode Hotel.

56. Mrs. Pike and her coworkers agreed they should make sure other judges would be present at dinner as well, to avoid similar behavior from Judge Budd. Mrs. Pike texted Judge Budd that Judge Larson wanted to go to dinner with them, but they did not have his contact information.

57. Judge Budd asked for the address of the Bode where he could meet Mrs. Pike and her female colleagues. Upon arrival, he stood outside the door of the hotel room and looked inside where he saw an open suitcase. Judge Budd said to one of Mrs. Pike's coworkers: "I can see your undergarments from here." Mrs. Pike again felt extremely uncomfortable.

58. Judge Budd and the Wellspring employees walked downtown to dinner. Judge Budd followed Mrs. Pike around at dinner and tried to make conversation with her repeatedly, which she tried to avoid.

59. After dinner, Judge Budd asked where Mrs. Pike and the other Wellspring female employees were going, and he followed them. At the next bar, Judge Budd came up behind Mrs. Pike on multiple occasions to engage her in conversation. Mrs. Pike became so uncomfortable with Judge Budd's pursuit that

8

she asked probation officer John Lappin, another member of the treatment court team, to stay by her side at the bar.

60. Because the bar was loud and he was having trouble hearing Mrs. Pike, Mr. Lappin asked her to step outside and tell him what was going on. Once they stepped outside, Judge Budd followed them out and stood right behind Mrs. Pike.

61. Judge Budd then followed the group to a line dancing bar. He went up to the bar to get drinks and returned to the group. Judge Budd sat directly beside Mrs. Pike and said, "that bartender doesn't think my jokes are funny. It's okay because my friend right here is much prettier anyway." Judge Budd was talking about Mrs. Pike when he referenced his "much prettier" friend.

62. For the rest of the evening, Judge Budd followed Mrs. Pike wherever she went. She was in fear of Judge Budd, who insisted that she wait for him before she left the bar, but also felt that she could not confront him explicitly about his behavior given his authority over her on the treatment court team.

63. Mrs. Pike realized that if she did not get out of Judge Budd's sight, she would have to ride back to the hotel alone with him. She therefore asked coworkers for help getting out of the bar and away from Judge Budd. One such coworker acknowledged that Judge Budd was following Mrs. Pike "with his eyes" everywhere she went, and he would pop up behind Mrs. Pike's shoulder every time she tried to get away from him.

64. Mrs. Pike pretended she was going to the bathroom with two female coworkers to avoid detection by Judge Budd, but then left the bar to get away

9

from Judge Budd's escalating sexual pursuit.

65. Mrs. Pike was placed in extreme, pervasive, and severe fear that Judge Budd was going to sexually assault her that night.

66. Based on Judge Budd's escalating behavior and his actions the previous night, during which he learned what room Mrs. Pike was in, her fear that Judge Budd would try to sexually assault her was both objectively and subjectively reasonable.

67. Mrs. Pike texted Judge Budd at 11:27 pm and said: "I'm heading back with the girls. Ryan (case manager) is staying for a bit tho. Have a good night."

68. Within minutes, Judge Budd texted Mrs. Pike back and said: "You still here? Can't believe you ditched me."

69. Mrs. Pike responded: "Sorry! Totally not intended. We went outside and there were a bunch of Lyfts outside and we just headed back. Ryan said you were all set though."

70. Judge Budd responded: "I haven't been ditched in a long time. But I recognize the rhythms. No more Boston creams for you." This referenced the donuts that Judge Budd brought to Mrs. Pike in court on Wednesdays.

71. Mrs. Pike did not respond to this last text and went back to her hotel room alone.

72. The next day, Mrs. Pike went to the conference but skipped the sightseeing tour with the rest of the group because she was so fearful of being pursued by Judge Budd.

73. Mrs. Pike felt incredibly anxious and sick to her stomach. She left

early the next morning for her flight home, terrified she would run into Judge Budd again or have to sit near him on the plane.

74. Once she returned home, Mrs. Pike called her other supervisor, Wellspring's Sarah Falvey, and told her about Judge Budd's conduct.

75. The following Monday, Mrs. Pike had a meeting with human resources at Wellspring and shared the story about Judge Budd's behavior again.

76. Mrs. Pike was so anxious and upset about appearing in court before Judge Budd again that she did not go the following Wednesday and asked her supervisor and another employee to go instead, which they did.

**C.    Judge Budd Continues his Harassment in Court**

77. The next time Mrs. Pike was scheduled to be in treatment court before Judge Budd was two weeks later. She intended to go to court and have Falvey join her to try to avoid being sexually harassed by Judge Budd.

78. When Mrs. Pike next walked into treatment court, Judge Budd walked straight over to her and placed a white bag in front of her with two Boston cream donuts in it.

79. Falvey attended the team meeting that included Judge Budd and then left. After that, Mrs. Pike was alone in the courtroom with case manager Ryan Auffant. Judge Budd walked into the courtroom wearing his robe and said: "Ms. Pike, I'd like to see you out back in chambers."

80. Mrs. Pike was terrified. She looked back at Ryan Auffant and he asked quietly if she was going to be okay. Mrs. Pike did not want to cause a scene or disobey Judge Budd in court, so she walked back toward chambers alone, in

11

fear.

81.   Mrs. Pike noted that the bailiff was down the hall so she remained in the doorway of Judge Budd's chambers so she could still see the bailiff.

82.   Still wearing his judicial robes, Judge Budd sat behind his desk and said to Mrs. Pike that he had been "thinking a lot about our trip to Nashville." He then said he was going to be "making a lot of changes at home" and/or in his marriage. It was clear to Mrs. Pike that Judge Budd was talking about leaving his wife and that he intended to continue pursuing Mrs. Pike sexually.

83.   Mrs. Pike said very little and slowly backed out of the doorway of Judge Budd's chambers. Judge Budd came up behind her and said: "Ms. Pike, one more thing. You are a very good listener." Mrs. Pike was so traumatized by this exchange that she walked back into the team meeting area, where she thought she was alone, and began sobbing. Another case manager named Eric Legassie came out of the bathroom nearby and asked Mrs. Pike what was wrong. Mrs. Pike told Mr. Legassie what happened, and he suggested that she leave for the day.

84.   Judge Budd's conduct amounted to sexual harassment and unequal treatment of Mrs. Pike by a state official because of her sex. It was both subjectively and objectively unwelcome and severe and pervasive enough to create a hostile and abusive work environment based on Mrs. Pike's sex.

**D.   Judge Budd's Harassment of Mrs. Pike was Part of a Pattern**

85.   Upon information and belief, Judge Budd's sexual harassment of Mrs. Pike was part of a pattern of sex discrimination and sexual harassment toward his subordinates, colleagues, and clients in Maine District Court.

86. Upon information and belief, Judge Budd has a reputation for flirting with clerks in various courthouses where he has presided.

87. Upon information and belief, Judge Budd is known to show favoritism toward young, attractive, female drug treatment court clients. Judge Budd treats such clients more favorably than male clients, or clients that he does not deem sexually attractive.

88. District Attorney Natasha Irving attended the same NADCP conference described above, at which Judge Budd sexually harassed Mrs. Pike.

89. On one of the evenings between July 25 and 28, 2022, Ms. Irving attended a program during cocktail hour.

90. Ms. Irving was chatting with Richard Gordon, statewide treatment court coordinator, when Judge Budd approached them.

91. Ms. Irving introduced herself to Judge Budd, and he knew that she was the District Attorney for several counties close to where he presided.

92. Within three minutes of meeting Ms. Irving, Judge Budd asked what hotel she was staying in.

93. Ms. Irving thought it looked like Judge Budd had consumed a couple of drinks, but he was not inebriated.

94. Ms. Irving indicated that she had to stay at a different hotel from where the conference was being conducted, because the judges booked all the rooms at that hotel.

95. Judge Budd told Ms. Irving: "Well, you can come sleep with me in my room."

96.     Richard Gordon was present when Judge Budd made this statement. Mr. Gordon immediately tried to get Judge Budd away from Ms. Irving, saying something like: "Ok, let's go."

97.     Ms. Irving did not say another word to Judge Budd. She was speechless, shocked, and both subjectively and objectively offended by this statement coming from a judge. Ms. Irving felt incredibly humiliated and professionally demoralized that a judge would sexually proposition her, especially in front of a colleague.

98.     Judge Budd's behavior toward Mrs. Pike was thus part of a pattern of sexual harassment and intentional abuse of power that was severe and pervasive enough to be actionable under the Equal Protection Clause.

## COUNT I
### (Equal Protection Violation Under 42 U.S.C. § 1983)

99.     Plaintiff repeats the allegations contained in Paragraphs 1 through 98 of this Second Amended Complaint as if fully set forth herein.

100.    Judge Budd, acting individually and under color of state law, violated Mrs. Pike's constitutional right to equal protection by engaging in behavior that created a hostile work environment.

101.    Judge Budd's harassment was sex-based, severe or pervasive, and affected the terms and conditions of Mrs. Pike's employment.

102.    Judge Budd's harassment was also state action because he engaged in that conduct in his official capacity as a state court judge and Mrs. Pike's supervisor, both at a required work event and in the state courthouse wearing his judicial robes.

Judge Budd's authority as Mrs. Pike's supervisor also enabled his harassment, made it more severe, and made Mrs. Pike less able to resist. And it foreseeably affected the work Mrs. Pike performed for the state under Judge Budd.

103. Thus, based on the foregoing facts, Judge Budd, acting individually and under color of state law, violated Mrs. Pike's constitutional right to equal protection by creating a sex-based hostile work environment.

104. As a direct and proximate result of Judge Budd's equal protection violation, Mrs. Pike endured severe emotional distress, pain and suffering, and other harm entitling her to damages under 42 U.S.C. § 1983.

105. Judge Budd knowingly acted with such outrageous and deliberate disregard of Mrs. Pike's clearly established constitutional rights that actual malice may be inferred, justifying an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Samantha Pike asks that this Court enter judgment in her favor and against Defendant Charles F. Budd, Jr., and award monetary damages, punitive damages, costs and attorney's fees, pre- and post-judgment interest, and such other and further relief as this Court deems just and appropriate.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial on all matters so triable under the laws and Constitution of the United States and the State of Maine.

Dated: May 6, 2025

*/s/ Laura H. White*

                                    Laura H. White, Bar No. 4025  
                                    WHITE & QUINLAN, LLC  
                                    62 Portland Road, Suite 21  
                                    Kennebunk, ME  04043  
                                    (207) 502-7484  
                                    *lwhite@whiteandquinlan.com*

## **CERTIFICATE OF SERVICE**

I, Laura H. White, hereby certify that on this 6th day of May, 2025, I filed the foregoing Plaintiff's Second Amended Complaint with the Court's CM/ECF system, which automatically sends notification to all counsel of record.


Dated: May 6, 2025 　　　　　　　　　　　　/s/ *Laura H. White*

　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　Laura H. White
　　　　　　　　　　　　　　　　　　　　　*Attorney for Plaintiff*
　　　　　　　　　　　　　　　　　　　　　WHITE & QUINLAN, LLC
　　　　　　　　　　　　　　　　　　　　　62 Portland Road, Suite 21
　　　　　　　　　　　　　　　　　　　　　Kennebunk, ME 04043
　　　　　　　　　　　　　　　　　　　　　Phone: (207) 502-7484
　　　　　　　　　　　　　　　　　　　　　*lwhite@whiteandquinlan.com*